# UNITED STATES *v.* SISSON

No. 305.   Argued January 20–21, 1970—Decided June 29, 1970

268

*Solicitor General Griswold* argued the cause for the United States. With him on the brief were *Assistant Attorney General Wilson, Francis X. Beytagh, Jr., Beatrice Rosenberg,* and *Roger A. Pauley.*

*John G. S. Flym* argued the cause and filed a brief for appellee.

Briefs of *amici curiae* were filed by *William G. Smith* for the Los Angeles Selective Service Law Panel; by *Norman Leonard* for the Lawyers' Selective Service Panel of San Francisco; by *Joseph B. Robison* for the American Jewish Congress; by *Samuel Rabinove* and *George Berlstein* for the American Jewish Committee; by *Herman Schwartz, Marvin M. Karpatkin,* and *Melvin L. Wulf* for the American Humanist Assn. et al.; by *Leo Rosen, Edward S. Greenbaum,* and *Nancy F. Wechsler* for the American Ethical Union, and by Frank P. Slaninger, *pro se.*

MR. JUSTICE HARLAN delivered the opinion of the Court.*

The Government seeks to appeal to this Court a decision by a District Court in Massachusetts holding that appellee Sisson could not be criminally convicted for refusing induction into the Armed Forces. The District Court's opinion was bottomed on what that court under-

---

*MR. JUSTICE BLACK joins only Part II C of this opinion. MR. JUSTICE BRENNAN, MR. JUSTICE STEWART, and MR. JUSTICE MARSHALL join the entire opinion.

stood to be Sisson's rights of conscience as a nonreligious objector to the Vietnam war, but not wars in general, under the Free Exercise and Establishment Clauses of the First Amendment and the Due Process Clause of the Fifth Amendment to the Constitution of the United States. The District Court's primary conclusion, reached after a full trial, was that the Constitution prohibited "the application of the 1967 draft act to Sisson to require him to render combat service in Vietnam" because as a "sincerely conscientious man," Sisson's interest in not killing in the Vietnam conflict outweighed "the country's present need for him to be so employed," 297 F. Supp. 902, 910 (1969).

The District Court characterized its own decision as an arrest of judgment, and the Government seeks review here pursuant to the "arresting judgment" provision of the Criminal Appeals Act, 18 U. S. C. § 3731, an Act that narrowly limits the Government's right to appeal in criminal cases to certain types of decisions. On October 13, 1969, this Court entered an order postponing further consideration of the question of jurisdiction to the hearing of the case on the merits, 396 U. S. 812 (1969). For reasons that we elaborate in what follows, we conclude that the decision below, depending as it does on facts developed at Sisson's trial, is not an arrest of judgment but instead is a directed acquittal. As such, it is not a decision that the Government can appeal. Consequently, this appeal must be dismissed for lack of jurisdiction without our considering the merits of this case. We, of course, intimate no view concerning the correctness of the legal theory by which the District Court evaluated the facts developed at the trial.[1]

---

[1] We have today granted certiorari in *Gillette* v. *United States* (No. 1170), and *Negre* v. *Larsen* (No. 1669, Misc.), in order to consider the "selective" conscientious objector issue that underlies the case now before us but which we cannot reach because of our conclusion that we have no jurisdiction to entertain this direct appeal.

As a predicate for our conclusion that we have no jurisdiction to entertain the Government's appeal, a full statement of the proceedings below is desirable.

I

A single-count indictment charged that Sisson "did unlawfully, knowingly and wilfully fail and neglect and refuse to perform a duty" imposed by the Military Selective Service Act of 1967 and its regulations, in violation of § 12 of the Act, 81 Stat. 105, 50 U. S. C. App. § 462 (a) (1964 ed., Supp. IV), because he failed to obey an order by his local draft board to submit to induction.

Prior to trial, Sisson's attorney moved to dismiss the indictment on three grounds. It was claimed that Sisson's refusal to submit to induction was justified first, because "the government's military involvement in Vietnam violates international law"; and, second, because Sisson "reasonably believed the government's military involvement in Vietnam to be illegal." As a third ground, Sisson claimed that the Selective Service Act and its regulations were unconstitutional (a) because the procedures followed by local boards lacked due process; and (b) because compulsory conscription during peacetime was unnecessary and stifled fundamental personal liberties. In support of the motion to dismiss, appellee stated:

> "At the time I refused to submit to induction into the armed forces I believed, as I believe today, that the United States military involvement in Vietnam is illegal under international law as well as under the Constitution and treaties of the United States. I believed then, and still believe, that my participation in that war would violate the spirit and the letter of the Nuremberg Charter. On the basis of my knowledge of that war, I could not participate in it without doing violence to the dictates of my conscience."

At the hearing on appellee's motion to dismiss, the District Judge said that he had "an open mind" concerning appellee's first and third grounds. However, the court said there was "nothing to" the second ground, noting that what "the defendant reasonably believes . . . cannot be raised in the way that you propose . . . because that does not appear on the face of the indictment." (App. 49.) The District Court later amplified this conclusion by saying:

> "Point 2 is plainly premature because nobody can test the issue as to whether defendant reasonably believes the government's military involvement in Vietnam is illegal without knowing what he reasonably believed, *and what he believed is a question of evidence and not a question which appears on the face of the indictment.*" (App. 52.) (Emphasis supplied.)

Defense counsel did not dispute the District Court's analysis, and noted that he had raised the issue in his motion to dismiss only "in the interest of economy," because "[i]t was not clear at the time I filed the motion that the government would challenge this fact." (App. 52.) The court expressed doubts concerning the Government's willingness to concede this fact, and, when asked by the court, the government counsel specifically stated his opposition to the motion to dismiss. The court thereupon found the "second ground" of the motion to dismiss without merit.

A short time after this hearing, the District Court issued two written opinions, 294 F. Supp. 511 and 515 (1968), that denied the other grounds of the motion to dismiss. After determining that appellee had the requisite standing to raise the issues involved, the court held that the political question doctrine foreclosed consideration of whether Congress could constitutionally draft for

an undeclared war, or could order Sisson to fight in the allegedly "genocidal war."

An order accompanying the second pretrial opinion also dealt with various offers of proof that defense counsel had made in an informal letter to the court, not part of the record. From the order it appears that appellee's counsel stated he would "offer evidence to show that [Sisson] properly refused to be inducted on the basis of his right of conscience, both statutory and constitutional." Not understanding the scope of this rather ambiguous offer of proof, the District Court in its order ruled that if Sisson wished to make a conscientious objector claim based on religious objections not to wars in general but to the Vietnam war in particular, Sisson should make his offer of proof initially to the judge

> "to elicit a ruling whether the First Amendment precludes the Congress from requiring one who has religious conscientious objections to the Vietnam war to respond to the induction order he received. If the Court rules favorably to defendant on the Constitutional issue of law, then both defense and prosecution are entitled to submit to the trier of fact evidence relevant to the question whether defendant indeed is a religious conscientious objector to the Vietnam war." 294 F. Supp., at 519.

At the trial, however, it appears that defense counsel did not try to prove that Sisson should have received a conscientious objector exemption, nor did he request a ruling on the First Amendment issues referred to by the trial court. Instead it seems that the defense strategy was to prove that Sisson believed the Vietnam war to be illegal under domestic and international law, and that this belief was reasonable. If unable to get a direct adjudication of the legality of the war, the defense at least

274

hoped to convince the jury that Sisson lacked the requisite intent to "wilfully" refuse induction.[2]

There was evidence submitted at the trial that did bear on the conscientious objector issue, however. When asked why he had refused induction, Sisson emphasized that he thought the war illegal. He also said that he felt the Vietnam war was "immoral," "illegal," and "unjust," and went against "my principles and my best sense of what was right." The court asked Sisson what the basis for his conclusions was, particularly what Sisson meant when he said the war was immoral. Sisson said that the war violated his feelings about (1) respect for human life, (2) value of man's freedom, and (3) the scale of destruction and killing consonant with the stated purposes of American intervention. Sisson also stated, in response to the trial judge's question, that his "moral values come from the same sources [the trial court had] mentioned, religious writings, philosophical beliefs."

The prosecution did not allow Sisson's testimony to stand without cross-examination. In apparent reliance

---

[2] Not only did the defense itself avoid advancing any theory or proof that Sisson deserved conscientious objector status, but there are even indications that the defense purposely attempted to keep the issue out of the case. For example, at one point in the trial the Marine officer who called Sisson for induction stated that Sisson had told him at the time that he was refusing induction because of religious belief, and his "conscientious objector status." (App. 143.) Later, when questioned by his own counsel, Sisson not only denied having the conversation with the officer but also stated that he had never applied for C. O. status (1) because he could not honestly claim "conscientious objection to war in any form as it is put on the Form 150"; and (2) because he believed "the system of exemptions and deferments [to be] unequal and [to discriminate] against those who do not have education . . . or money." Sisson stated flatly that he therefore "could not accept such deferment." (App. 147–150.)

on the court's pretrial ruling that Sisson's beliefs concerning the war were irrelevant to the question of whether his refusal to submit to induction was wilful,[3] the government counsel concentrated on showing that Sisson had refused induction deliberately, of his own free will, and knowing the consequences. The prosecution also brought out that Sisson had failed to appeal his I–A classification when it had been issued, and that he had accepted, as an undergraduate, a II–S student classification.

In the final arguments to the jury, just as in the opening statements, neither counsel mentioned a religious or nonreligious conscientious objector issue. The defense argued that the key to the case was whether Sisson had "wilfully" refused to submit to induction, and tried to suggest his beliefs about the war were relevant to this. The government lawyer simply pointed out the operative facts of Sisson's refusal. He also attacked Sisson's sincerity by pointing out the inconsistency between Sissons' broad statements that he opposed deferments because they discriminated against the poor,

---

[3] Among the various offers of proof made by Sisson's attorney before the trial was one to show that Sisson "reasonably believed the Vietnam war to be illegal," and that he therefore lacked the requisite intent to "wilfully" refuse induction. In the pretrial order, the trial judge ruled that:

" 'Wilfully' as used in the indictment means intentionally, deliberately, voluntarily. If the Government proves defendant intentionally refused to comply with an order of his draft board, in accordance with the statute, to submit to induction, it is not open to defendant to offer as an excuse that he regarded the war as illegal, that is, contrary to either domestic Constitutional law or international law . . . . [I]n a prosecution for wilfully refusing to obey an induction order, evidence with respect to belief is admissible only to the extent it bears upon the issue of intent, as distinguished from motive or good faith." 294 F. Supp., at 519.

see n. 2, *supra,* and his willingness to accept a II–S deferment while he was at Harvard College. (See App. 187–188.)

The instructions to the jury made no reference to a conscientious objector claim, and the jury was not asked to find whether Sisson was "sincere" in his moral beliefs concerning the war. Instead the trial court told the jury that the crux of the case was whether Sisson's refusal to submit to induction was "unlawfully, knowingly and wilfully" done.[4] The jury, after deliberating about 20 minutes, brought in a verdict of guilty.

After the trial, the defendant made a timely motion under Fed. Rule Crim. Proc. 34 to arrest the judgment on the ground that the District Court lacked jurisdiction.[5] Pointing to the fact that the District Court had ruled before the trial that the political question doctrine prevented its consideration of defenses requiring an adjudication of the legality of the Vietnam war, the defense

---

[4] The key instruction was given as follows:

"The only question which as a matter of law a Jury has a right to consider is whether the defendant if he failed to perform an act required under the statute and regulations was acting knowingly in the sense of with mental awareness, [and] wilfully in the sense of intentionally and with free choice.

"He may have all the views he likes of a political, ethical, religious or legal nature. They may be as reasonable as sometimes dissents of the Supreme Court are reasonable and sometimes the majority Opinions are reasonable, but as long as the law stands as it now stands his motivation, his good faith and the like are not in the least relevant to the question whether he is guilty or not." (App. 193.)

[5] Defendant first submitted a motion in arrest of judgment March 26—five days after the trial. Two days later he substituted an amended motion in arrest "in lieu of" his original motion. This first amended motion differed only in detail from the original. Both were based on the jurisdictional argument described in the text and neither made any claim based on the Establishment or Free Exercise Clause.

argued that the court therefore lacked jurisdiction under Article III and the Due Process Clause to try the defendant for an offense to which the illegality of the war might provide a defense.

The District Court, in granting what it termed a motion in arrest of judgment, did not rule on the jurisdictional argument raised in the defense motion. Instead, the court ruled on what it termed defendant's "older contention" [6] that the indictment did not charge an offense based on defendant's "never-abandoned" Establishment, Free Exercise, and Due Process Clause arguments relating to conscientious objections to the Vietnam war.

The court first stated the facts of the case, in effect making findings essential to its decision. The opinion

---

[6] The District Court was apparently referring to Sisson's pretrial "offer [of] evidence" with reference to Sisson's "right of conscience." See *supra*, at 273; 294 F. Supp., at 519. It does not appear that any contention based on Sisson's right of conscience was raised at trial, or made in the motion to arrest judgment, see *supra*, n. 5. Possibly in recognition of this, the District Court noted in its opinion that "[i]t would have been better practice" for Sisson's attorney to have made "a more detailed reference" in his motion in arrest to his "earlier" arguments. The court stated that "[n]o doubt, defendant will seasonably make his motion in arrest even clearer." On April 3—two days after the District Court's decision—Sisson's attorney moved to amend his motion in arrest to make the requested grounds conform with those already stated in the opinion. The District Court granted this motion to amend *nunc pro tunc* as of April 1—the date of its opinion.

Because we conclude that the District Court's decision was not in fact one arresting judgment, see *infra*, we have no occasion to decide whether the District Court incorrectly characterized these issues as having been raised by the defendant, and if so, whether the 1966 amendment to Fed. Rule Crim. Proc. 34, requiring that a motion in arrest of judgment be granted "on motion of a defendant," precludes a district court from granting such a motion on an issue not raised by the defendant's motion.

describes how Sisson's demeanor on the stand convinced the court of his sincerity. The court stated that "Sisson's table of ultimate values is moral and ethical . . . [and] reflects quite as real, pervasive, durable, and commendable a marshalling of priorities as a formal religion." The critical finding for what followed was that:

> "What another derives from the discipline of a church, Sisson derives from the discipline of conscience.
> ". . . Sisson bore the burden of proving by objective evidence that he was sincere. He was as genuinely and profoundly governed by his conscience as would have been a martyr obedient to an orthodox religion." 297 F. Supp., at 905.

Building on these findings, the court first held that the Free Exercise and Due Process Clauses "prohibit the application of the 1967 draft act to Sisson to require him to render combat service in Vietnam" because as a "sincerely conscientious man," Sisson's interest in not killing in the Vietnam conflict outweighed "the country's present need for him to be so employed." The District Court also ruled that § 6 (j) of the Selective Service Act, 50 U. S. C. App. § 456 (j) (1964 ed., Supp. IV), offends the Establishment Clause because it "unconstitutionally discriminated against atheists, agnostics, and men, like Sisson, who, whether they be religious or not, are motivated in their objection to the draft by profound moral beliefs which constitute the central convictions of their beings." 297 F. Supp., at 911.

## II

The Government bases its claim that this Court has jurisdiction to review the District Court's decision exclusively on the "arresting judgment" provision of the

Criminal Appeals Act, 18 U. S. C. § 3731.[7]  The relevant statutory language provides:

> "An appeal may be taken by and on behalf of the United States from the district courts direct to the Supreme Court of the United States in all criminal cases in the following instances:
>
> .        .        .        .        .
>
> "From a decision arresting a judgment of conviction for insufficiency of the indictment or information, where such decision is based upon the invalidity or construction of the statute upon which the indictment or information is founded."

Thus, three requirements must be met for this Court to have jurisdiction under this provision. First, the decision of the District Court must be one "arresting a judgment of conviction." Second, the arrest of judg-

---

[7] For the text, see n. 20, *infra.*

It should be noted that at the conclusion of his opinion, the District Judge stated that he was granting the motion in arrest because "[i]n the words of Rule 34, the indictment of Sisson 'does not charge an offense.'" He then stated in conclusory terms that his decision was one "'arresting a judgment of conviction for insufficiency of the indictment . . . [which] is based upon the invalidity . . . of the statute upon which the indictment . . . is founded'" for purposes of 18 U. S. C. § 3731, and that the Government could therefore take a direct appeal to this Court.

The label attached by the District Court to its own opinion does not, of course, decide for us the jurisdictional issue, however. "We must be guided in determining the question of appealability of the trial court's action not by the name the court gave [its decision] but by what in legal effect it actually was," *United States* v. *Waters,* 84 U. S. App. D. C. 127, 128, 175 F. 2d 340, 341, appeal dismissed on Government's motion, 335 U. S. 869 (1948); *United States* v. *Zisblatt,* 172 F. 2d 740, 742 (C. A. 2d Cir.), appeal dismissed on Government's motion, 336 U. S. 934 (1949); see *United States* v. *Hark,* 320 U. S. 531, 536 (1944); *United States* v. *Blue,* 384 U. S. 251, 254 (1966).

ment must be for the "insufficiency of the indictment or information." And third, the decision must be "based upon the invalidity or construction of the statute upon which the indictment or information is founded." [8]

Because the District Court's decision rests on facts not alleged in the indictment but instead inferred by the court from the evidence adduced at trial, we conclude that neither the first nor second requirement is met. [9]

## A

We begin with the first requirement: was the decision below one "arresting a judgment of conviction"? In using that phrase in the Criminal Appeals Act, Congress did not, of course, invent a new procedural classification. Instead, Congress acted against a common-law background that gave the statutory phrase a well-defined and limited meaning. An arrest of judgment was the technical term describing the act of a trial judge refusing to enter judgment on the verdict because of an error appearing on the face of the record that rendered the judgment

---

[8] Although all three conditions must be met for the Government to appeal a case directly to this Court, as long as the first requirement is met the Government can appeal to a Court of Appeals under a separate provision of § 3731 allowing an appeal "[f]rom a decision arresting a judgment of conviction except where a direct appeal to the Supreme Court of the United States is provided . . . ."

[9] It is arguable that the third requirement is not met since the District Court's decision was not "based upon the invalidity or construction" of 50 U. S. C. App. § 462 (a) (1964 ed., Supp. IV)—the statutory provision "upon which the indictment . . . is founded." As a matter of sound construction, however, "statute upon which the indictment . . . is founded" should be read to include the entire statute, and not simply the penalty provisions. See *United States* v. *Socony Mobil Oil Co.*, 252 F. 2d 420 (C. A. 1st Cir.), appeal dismissed per stipulation, 356 U. S. 925 (1958); cf. *United States* v. *Mersky*, 361 U. S. 431 (1960); see also Friedenthal, Government Appeals in Federal Criminal Cases, 12 Stan. L. Rev. 71, 75 (1959).

invalid. 3 W. Blackstone, Commentaries *393; 3 H. Stephen, New Commentaries on the Laws of England 628 (1st Am. ed. 1845); 2 J. Bishop, New Criminal Procedure § 1285 (2d ed. 1913).

For the purpose of this case the critical requirement is that a judgment can be arrested only on the basis of error appearing on the "face of the record," and not on the basis of proof offered at trial.[10] This requirement can be found in early English common-law cases. In *Sutton* v. *Bishop*, 4 Burr. 2283, 2287, 98 Eng. Rep. 191, 193 (K. B. 1769), it was stated: "[T]he Court ought not to arrest judgments upon matters not appearing upon the face of the record; but are to judge upon the record itself." Once transported to the United States,[11] this essential limitation of arrests of judgment was explicitly acknowledged by this Court. In *United States* v. *Klintock*, 5 Wheat. 144, 149 (1820), the Court stated that "judgment can be arrested only for errors apparent on the record." And later in *Bond* v. *Dustin*, 112 U. S. 604 (1884), the Court said, "[A] motion in arrest of judgment can only be maintained for a defect apparent upon the face of the record, and the evidence is no part of the record for this purpose," *id.*, at 608. See *Carter* v. *Bennett*, 15 How. 354, 356–357 (1854); *United States* v. *Norris*, 281 U. S. 619 (1930).

This venerable requirement of the common law has been preserved under the Federal Rules of Criminal Procedure, for the courts have uniformly held that in grant-

---

[10] In early days the "face of the record" simply included the material found on the "judgment roll." See *United States* v. *Zisblatt*, 172 F. 2d, at 742. In a criminal case today it has been thought to include "no more than the indictment, the plea, the verdict . . . and the sentence." *United States* v. *Bradford*, 194 F. 2d 197, 201 (C. A. 2d Cir.), cert. denied, 343 U. S. 979 (1952).

[11] This Court first recognized the existence of motions in arrest of judgment in *United States* v. *Cantril*, 4 Cranch 167 (1807).

ing a motion in arrest of judgment under Rule 34,[12] a district court must not look beyond the face of the record. *E. g., United States* v. *Zisblatt,* 172 F. 2d 740 (C. A. 2d Cir.), appeal dismissed on Government's motion, 336 U. S. 934 (1949); *United States* v. *Lias,* 173 F. 2d 685 (C. A. 4th Cir.. 1949); *United States* v. *Bradford,* 194 F. 2d 197 (C. A. 2d Cir. 1952). See 2 C. Wright, Federal Practice and Procedure § 571 (1969); 5 L. Orfield, Criminal Procedure Under the Federal Rules § 34:7 (1967). Therefore, whether we interpret the statutory phrase "decision arresting a judgment" as speaking "to the law, as it then was [in 1907] . . . as it had come down from the past,"[13] or do no more than interpret it as simply imposing the standards of Fed. Rule Crim. Proc. 34,[14] a decision based on evidence adduced at trial cannot be one arresting judgment.[15]

---

[12] Fed. Rule Crim. Proc. 34 provides:

"The court on motion of a defendant shall arrest judgment if the indictment or information does not charge an offense or if the court was without jurisdiction of the offense charged. The motion in arrest of judgment shall be made within 7 days after verdict or finding of guilty, or after plea of guilty or *nolo contendere,* or within such further time as the court may fix during the 7-day period."

[13] *United States* v. *Zisblatt, supra,* at 742.

[14] *United States* v. *Lias, supra,* at 687.

[15] None of the cases relied on by the Government even hints that evidence presented at the trial can be the basis for a motion in arrest of judgment. In *United States* v. *Green,* 350 U. S. 415 (1956), there was no disagreement between the majority and dissenters on the rule that direct review is impossible if the decision below is based upon facts arising from the trial. Instead the majority and dissent simply disagreed as to whether the District Court's decision *had* relied on evidence at the trial. Compare the majority opinion, 350 U. S., at 418 and 421, with the dissent, 350 U. S., at 421. In *United States* v. *Bramblett,* 348 U. S. 503 (1955), also cited by the Government, the indictment specified that the appellee had made a fraudulent claim against the Disbursing Office

The court below clearly went beyond the "face of the record" in reaching its decision. As noted earlier, the opinion explicitly relies upon the evidence adduced at the trial, including demeanor evidence, for its findings that Sisson was "sincere" and that he was "as genuinely and profoundly governed by his conscience" as a religious conscientious objector.

To avoid the inescapable conclusion that the District Court's opinion was not an arrest of judgment, the Government makes two arguments. First, the Government suggests that these factual findings of the District Court, based on the evidence presented at trial, were not essential to its constitutional rulings, but instead only part of "the circumstantial framework" of the opinion below. (Jurisdictional Statement 9; see Brief 8.) This

of the House of Representatives in violation of 18 U. S. C. § 1001 which forbids the willful falsification of any material statement "in any matter within the jurisdiction of any department or agency of the United States." The District Court arrested judgment on the ground that the House Disbursing Office was not a "department or agency" for purposes of the statute, and on appeal this Court reversed. Neither the District Court nor this Court relied in any way upon the evidence submitted at the trial in determining the scope of the statutory phrase "department or agency" found in 18 U. S. C. § 1001. Finally, the Government refers to *United States* v. *Waters*, 84 U. S. App. D. C. 127, 175 F. 2d 340 (1948). In that case the District Court held an indictment did not charge an offense because it alleged only that the appellee was carrying a gun, and not that he was carrying a gun without a license. However, the District Court called its opinion the grant of a motion of acquittal. The United States appealed to the Court of Appeals which held that the decision was a motion in arrest, stating that the "question of appealability" turned not on "the name the [district] court gave [the decision] but by what in legal effect it actually was." The Court of Appeals then certified the case to this Court, since it felt the motion in arrest involved an "interpretation" of the underlying statute, but the appeal was dismissed on the motion of the United States, 335 U. S. 869 (1948).

cannot withstand analysis, however, for the factual findings were absolutely essential, under the District Court's own legal theory, to its disposition of the case. Without a finding that Sisson was sincerely and fundamentally opposed to participation in the Vietnam conflict, the District Court could not have ruled that under the Due Process and Free Exercise Clauses Sisson's interest in not serving in Vietnam outweighed the Government's need to draft him for such service.[16]

Second, the Government argues that even though the District Court made findings on evidence adduced at trial, the facts relied on were "undisputed." Adopting the language used by the court below, the Government claims that "in substance the case arises upon an agreed statement of facts." 297 F. Supp., at 904. The Government then goes on to argue that decisions of this Court have "recognized that a stipulation of facts by the parties in a criminal case" can be relied on by the District Court without affecting the jurisdiction for an appeal, citing *United States* v. *Halseth,* 342 U. S. 277 (1952), and *United States* v. *Fruehauf,* 365 U. S.

---

[16] The factual determinations would also appear essential for the District Court's alternative ground of decision based on the Establishment Clause. That holding rests necessarily upon the finding that Sisson, though nonreligious, "was as genuinely and profoundly governed by his conscience as would have been a martyr obedient to an orthodox religion." Without this finding, Sisson would have no standing to assert the underinclusiveness of § 6 (j) of the Act as a defense to his prosecution. Whether factual determinations made only for purposes of deciding questions of standing, particularly if made before trial, would offend the requirements that motions in arrest must be based on errors on the face of the record is an issue inappropriate for decision in this case. Because of our determination that the District Court's free exercise holding was in effect an acquittal, there is no need to decide whether the alternative Establishment Clause ruling would be appealable if it stood alone.

146 (1961). The Government then concludes that it would be exalting form over substance to hold there was no appeal in a case where the Government has not contested the facts, and yet allow an appeal to lie from a motion to dismiss resting upon a stipulation of the parties.

Preliminarily, it should be noted that this Court has never held that an appeal lies from a decision which depends, not upon the sufficiency of the indictment alone, but also on a stipulation of the parties. In *Halseth* the parties did enter into a stipulation for purposes of a motion to dismiss. But the facts in the stipulation were irrelevant to the legal issue of whether the federal anti-lottery statute reached a game not yet in existence. Therefore, neither the District Court in dismissing the indictment, nor this Court in affirming its decision, had to rely on the stipulation. And, for purposes of deciding whether jurisdiction for an appeal under § 3731 existed, the Court obviously did not have to decide—and it did not discuss—whether reliance on a stipulation would make any difference. Insofar as *United States* v. *Fruehauf, supra,* the other case cited by the Government, is relevant at all it seems to point away from the Government's contention. In *Fruehauf* this Court refused to consider the merits of an appeal under § 3731 from a District Court decision dismissing an indictment on the basis of a " 'judicial admission' culled from a pre-trial memorandum" of the Government by the District Judge. Rather than penalizing the Government by dismissing the appeal, however, the Court simply exercised its discretion under 28 U. S. C. § 2106 by setting aside the ruling below, and remanding the case for a new trial on the existing indictment.

Not only do the cases cited by the Government fail to establish its contention, but other authority points strongly in the opposite direction. In *United States* v. *Norris,* 281 U. S. 619 (1930), this Court said that a "stip-

ulation was ineffective to import an issue as to the sufficiency of the indictment, or an issue of fact upon the question of guilt or innocence," because of "the rule that nothing can be added to an indictment without the concurrence of the grand jury," *id.*, at 622. While it is true that *Norris* is complicated by the fact that the defendant had entered a guilty plea, the Court said that even "[i]f [the stipulation had been] filed before plea and [had been] given effect, such a stipulation would oust the jurisdiction of the court," *id.*, at 622–623. *Norris*, together with the policy, often expressed by this Court, that the Criminal Appeals Act should be strictly construed against the Government's right to appeal, see, *e. g.*, *United States* v. *Borden Co.*, 308 U. S. 188, 192 (1939), makes it at least very doubtful whether the parties should, on the basis of a stipulation, be able to secure review under the motion-in-arrest provisions of § 3731.

We do not decide that issue, however, for there was nothing even approaching a stipulation here. Before the court's final ruling below, the parties did not in any way, formally or informally, agree on the factual findings made in its opinion. It is relevant to recall that before the trial the government attorney specifically refused to stipulate whether Sisson sincerely believed the war to be illegal, and, if so, whether such a belief was reasonable. Moreover, given that the government attorney cross-examined Sisson, and later pointed out the inconsistency between Sisson's acceptance of a II–S student deferment and his claim that he disapproved of deferments as unfair, it hardly seems the Government accepted Sisson's sincerity insofar as it was an issue in the case. Therefore, far from being like a case with a formal stipulation between the parties, the most that can be said is that *after* the District Court's decision the Government chose to accept the opinion's findings of fact. Even assuming reliance on a formal stipulation were per-

missible, it would still be intolerable to allow direct review whenever the District Court labels its decision a motion in arrest, and the Government merely accepts the lower court's factual findings made after a trial—for this would mean the parties and the lower court simply could foist jurisdiction upon this Court.

## B

The second statutory requirement, that the decision arresting judgment be "for insufficiency of the indictment," is also not met in this case. Senator Nelson, one of the sponsors of the Criminal Appeals Act, made it plain during the debates that this second element was an important limitation. He said:

> "The arrest of judgment . . . on which an appeal lies, is not a general motion covering all the grounds on which a judgment may be arrested. It is simply for arrest of judgment because of the insufficiency of the indictment—*that is, the failure of the indictment to charge a criminal offense.*" 41 Cong. Rec. 2756. (Emphasis supplied.)

See also 40 Cong. Rec. 9033. Although the District Court's opinion recites as a conclusion that the indictment in this case did "not charge an offense" for purposes of Rule 34, surely the indictment alleged the necessary elements of an offense.[17] The deci-

---

[17] Compare 50 U. S. C. App. § 462 (a) (1964 ed., Supp. IV) with the allegations of the indictment:

"That on or about April 17, 1968, at Boston, in the District of Massachusetts, JOHN HEFFRON SISSON, JR., of Lincoln, in the District of Massachusetts did unlawfully, knowingly and wilfully fail and neglect and refuse to perform a duty required of him under and in the execution of the Military Selective Service Act of 1967 and the rules, regulations and directions duly made pursuant thereto, particularly 32 Code of Federal Regulations 1632.14, in that he did fail and neglect and refuse to comply with an order of his local

sion below rests on affirmative defenses which the court thought Sisson could claim because of *his* beliefs. It has never been thought that an indictment, in order to be sufficient, need anticipate affirmative defenses, *United States* v. *Fargas,* 267 F. Supp. 452, 455 (D. C. S. D. N. Y. 1967) ("Any questions as to the validity of the local board's refusal to grant conscientious objector exemption are matters of defense . . . [that] [t]here is no necessity for the indictment to negate . . ."). Moreover, even assuming, *arguendo,* the correctness of the District Court's constitutional theory that sincere nonreligious objectors to particular wars have a constitutional privilege that bars conviction, the facts essential to Sisson's claim of this privilege do not appear from any recitals in the indictment. As the District Court itself said before trial, "[W]hat [Sisson] believed is a question of evidence and not a question which appears on the face of the indictment." (App. 52.) In short, this indictment cannot be taken as insufficient for, on the one hand, it recites the necessary elements of an offense, and on the other hand, it does not allege facts that themselves demonstrate the availability of a constitutional privilege.

## C

The same reason underlying our conclusion that this was not a decision arresting judgment—*i.e.,* that the disposition is bottomed on factual conclusions not found in the indictment but instead made on the basis of evidence adduced at the trial—convinces us that the decision was in fact an acquittal rendered by the trial court after the jury's verdict of guilty.

draft board to submit to induction into the armed forces of the United States; in violation of Title 50, Appendix, United States Code, Section 462."

For purposes of analysis it is helpful to compare this case to one in which a jury was instructed as follows:

"If you find defendant Sisson to be sincere, and if you find that he was as genuinely and profoundly governed by conscience as a martyr obedient to an orthodox religion, you must acquit him because the government's interest in having him serve in Vietnam is outweighed by his interest in obeying the dictates of his conscience. On the other hand, if you do not so find, you must convict if you find that petitioner did wilfully refuse induction."

If a jury had been so instructed, there can be no doubt that its verdict of acquittal could not be appealed under § 3731 *no matter how erroneous the constitutional theory underlying the instructions.* As Senator Knox said of the bill that was to become the Criminal Appeals Act:

"Mark this: It is not proposed to give the Government any appeal under any circumstances when the defendant is acquitted *for any error whatever committed by the court.*

.     .     .     .     .

"The Government takes the risks of all the mistakes of its prosecuting officers *and of the trial judge in the trial,* and it is only proposed to give it an appeal upon questions of law raised by the defendant to defeat the trial and if it defeats the trial.

"The defendant gets the benefit of all errors in the trial which are in his favor, and can challenge all errors in the trial which are against him." 41 Cong. Rec. 2752.

Quite apart from the statute, it is, of course, well settled that an acquittal can "not be reviewed, on error or otherwise, without putting [the defendant] twice in jeopardy, and thereby violating the Constitution. . . . [I]n this country a verdict of acquittal, although not followed by

any judgment, is a bar to a subsequent prosecution for the same offence," *United States* v. *Ball,* 163 U. S. 662, 671 (1896).[18]

There are three differences between the hypothetical case just suggested and the case at hand. First, in this case it was the judge—not the jury—who made the factual determinations. This difference alone does not support a legal distinction, however, for judges, like juries, can acquit defendants, see Fed. Rule Crim. Proc. 29. Second, the judge in this case made his decision *after* the jury had brought in a verdict of guilty. Rules 29 (b) and (c) of the Federal Rules of Criminal Procedure, however, expressly allow a federal judge to acquit a criminal defendant after the jury "returns a verdict of guilty." And third, in this case the District Judge labeled his post-verdict opinion an arrest of judgment, not an acquittal. This characterization alone, however, neither confers jurisdiction on this Court, see n. 7, *supra,* nor makes the opinion any less dependent upon evidence adduced at the trial. In short, we see no distinction between what the court below did, and a post-verdict directed acquittal.[19]

---

[18] This principle would dictate that after this jurisdictional dismissal, Sisson may not be retried.

[19] Our conclusion does not, as suggested in dissent, *post,* at 327 (dissenting opinion of MR. JUSTICE WHITE), rest on the fact the District Court "might have" sent the case to the jury on the instruction referred to in the text, but instead on what it did do— *i. e.,* render a legal determination on the basis of facts adduced at the trial relating to the general issue of the case, see, *infra,* at 301. Neither dissenting opinion explains what "large and critical" difference, *post,* at 329, exists between its expansive notion of what constitutes a decision arresting judgment and a post-verdict acquittal entered by the judge after the jury has returned a verdict of guilty pursuant to Fed. Rule Crim. Proc. 29.

We think untenable the view of MR. JUSTICE WHITE that under the principles of this opinion today the "Court should not have had jurisdiction in *United States* v. *Covington,*" 395 U. S. 57 (1969),

## III

The dissenting opinions of both THE CHIEF JUSTICE and MR. JUSTICE WHITE suggest that we are too niggardly in our interpretation of the Criminal Appeals Act, and each contends that the Act should be more broadly construed to give effect to an underlying policy that is said to favor review. This Court has frequently stated that the "exceptional right of appeal given to the Government by the Criminal Appeals Act is strictly limited to the instances specified," *United States* v. *Borden Co.,* 308 U. S. 188, 192 (1939), and that such appeals "are something unusual, exceptional, not favored," *Carroll* v. *United States,* 354 U. S. 394, 400 (1957); see *United States* v. *Keitel,* 211 U. S. 370, 399 (1908); *United States* v. *Dickinson,* 213 U. S. 92, 103 (1909); cf. *Will* v. *United States,* 389 U. S. 90, 96 (1967). The approach suggested by our Brothers seems inconsistent with these notions. Moreover, the background and legislative history of the Criminal Appeals Act demonstrate the compromise origins of the Act that justify the principle of strict construction this Court has always said should be placed on its provisions. Because the Criminal Appeals Act,

---

on the ground that the pretrial dismissal in that case "would amount to an acquittal because the judge *might have* given the case to the jury under instructions that it should acquit if it found the facts necessary to sustain the defendant's privilege—*e. g.,* that he was not one of the registered marihuana dealers whose conduct was legal under state law," *post,* at 327 (emphasis in original). As we note, *infra,* n. 56, what the District Court did do in *Covington* was to dismiss an indictment *before trial without any evidentiary hearing.* Moreover, in disposing of the Government's contentions on the merits, this Court held that there was no need in that case for a pretrial evidentiary hearing on the defendant's motion to dismiss (much less a need to submit any factual issue to a jury) because (1) "there is no possibility of any factual dispute with regard to the hazard of incrimination"; and (2) "the Government [had] never alleged the existence of a factual controversy" concerning appellee's nonwaiver of his privilege against self-incrimination, 395 U. S., at 61.

now 18 U. S. C. § 3731 (1964 ed., Supp. IV),[20] has descended unchanged in substance from the original Criminal Appeals Act, which was enacted on March 2, 1907, 34 Stat. 1246,[21] the crucial focus for this inquiry must be the legislative history of the 1907 Act.[22]

[20] The statute provides, in pertinent part:

"An appeal may be taken by and on behalf of the United States from the district courts direct to the Supreme Court of the United States in all criminal cases in the following instances:

"From a decision or judgment setting aside, or dismissing any indictment or information, or any count thereof, where such decision or judgment is based upon the invalidity or construction of the statute upon which the indictment or information is founded.

"From a decision arresting a judgment of conviction for insufficiency of the indictment or information, where such decision is based upon the invalidity or construction of the statute upon which the indictment or information is founded.

"From the decision or judgment sustaining a motion in bar, when the defendant has not been put in jeopardy."

The statute goes on to provide for (1) Government appeals to the courts of appeals for all other decisions (a) setting aside or dismissing indictments, or (b) arresting judgments; (c) granting a pretrial suppression motion; (2) release on bail; (3) transfer of cases from this Court to a court of appeals or vice versa when an appeal has erroneously been taken to the wrong court.

[21] 34 Stat. 1246 provided in pertinent part:

". . . That a writ of error may be taken by and on behalf of the United States from the district or circuit courts direct to the Supreme Court of the United States in all criminal cases, in the following instances, to wit:

"From a decision or judgment quashing, setting aside, or sustaining a demurrer to, any indictment, or any count thereof, where such decision or judgment is based upon the invalidity, or construction of the statute upon which the indictment is founded.

"From a decision arresting a judgment of conviction for insufficiency of the indictment, where such decision is based upon the invalidity or construction of the statute upon which the indictment is founded.

"From the decision or judgment sustaining a special plea in bar, when the defendant has not been put in jeopardy."

[22] Between 1907 and the present day, Congress has amended the Act several times. These include a 1948 amendment that brought

### A

Beginning in 1892—15 years before the enactment of the Criminal Appeals Act—the Attorneys General of the United States regularly recommended passage of legislation allowing the Government to appeal in criminal cases.[23]  Their primary purpose was perhaps best expressed by Attorney General Miller in his 1892 report: "As the law now stands . . . it is in the power of a single district judge, by quashing an indictment, to defeat any criminal prosecution instituted by the Government."[24]  There was no progress, however, until President Theodore Roosevelt, outraged by a decision of

---

the procedural vocabulary of the statute into formal conformity with the Federal Rules of Criminal Procedure, 62 Stat. 844. Although "special plea in bar" thus became "motion in bar," and "decision . . . quashing . . . or sustaining a demurrer to, any indictment" became "decision . . . dismissing any indictment," the Reviser's Notes plainly show that this amendment was not meant to change the Act's coverage, H. R. Rep. No. 304, 80th Cong., 1st Sess., A177; see *United States* v. *Apex Distributing Co.*, 270 F. 2d 747, 755 (C. A. 9th Cir. 1959).

A 1942 amendment did increase this Court's jurisdiction under the Act by including cases involving informations as well as indictments, 56 Stat. 271. Other amendments have (1) abolished review by writ of error and substituted the right of appeal, 45 Stat. 54 (1928); (2) given the courts of appeals jurisdiction for appeals from decisions in the same common-law categories as those originally provided, but which do not involve the construction or validity of the underlying statute, 56 Stat. 271.

[23] See the Attorney General's Annual Reports for 1892, pp. xxiv–xxv; for 1893, p. xxvi; for 1894, p. xxix; for 1899, p. 33; for 1900, p. 40; for 1903, p. vi; for 1905, p. 10; for 1906, p. 4. See generally Kurland, The *Mersky* Case and the Criminal Appeals Act: A Suggestion for Amendment of the Statute, 28 U. Chi. L. Rev. 419, 446–449 (1961); F. Frankfurter & J. Landis, The Business of the Supreme Court 114–117 (1928).

[24] 1892 Rep. Atty. Gen. xxiv.

Judge Humphrey preventing the prosecution of the Beef Trust,[25] made this proposed reform into a "major political issue,"[26] and demanded the enactment of legislation in his 1906 annual message to Congress.[27]

The House, as one commentator has written, "was obedient to the presidential command."[28] It passed, without debate,[29] a very broad bill giving the Government the same right to appeal legal issues decided adversely to it as had earlier been accorded a criminal defendant.[30] The Senate would not accept any such sweeping change of the traditional common-law rule giving the Government no appeal at all. The substitute bill that the Senate Judiciary Committee reported out[31] narrowed the House bill substantially, and limited the Government's right to appeal to writs of error from decisions (1) quashing an indictment or sustaining a demurrer to an indictment; (2) arresting judgment of conviction because of the insufficiency of the indictment; and (3) sustaining special pleas in bar when the defendant had not been put in jeopardy. Even as narrowed,

---

[25] *United States* v. *Armour & Co.*, 142 F. 808 (D. C. N. D. Ill. 1906).

[26] See Frankfurter & Landis, *supra*, n. 23, at 117; Kurland, *supra*, n. 23, at 449.

[27] 41 Cong. Rec. 22.

[28] Kurland, *supra*, n. 23, at 450.

[29] 40 Cong. Rec. 5408.

[30] The text of the House bill appears at 40 Cong. Rec. 5408. It gave the United States the same right of review by writ of error as was then accorded a criminal defendant, but further provided that if on appeal any error were found, the defendant should retain the advantage of any verdict in his favor. With neither debate nor a division, the bill passed the House on April 17, 1906. *Ibid.*

[31] See S. Rep. No. 3922, 59th Cong., 1st Sess. (1906).

the bill met opposition on the floor,[32] and the session closed without Senate action.[33]

The next session, after the bill was again reported out of the Senate Judiciary Committee,[34] it was debated for three days on the floor and again met strong opposition.[35] Reflecting the deep concern that the legislation not jeopardize interests of defendants whose cases were appealed by the Government, amendments were adopted requiring the Government to appeal within 30 days and to prosecute its cases with diligence;[36] and allowing defendants whose cases were appealed to be released on their own recognizance in the discretion of the presiding judge.[37] Various Senators were particularly concerned lest there be any possibility that a defendant who had already been through one trial be subjected to another trial after a successful appeal by the Government.[38] In response to this concern, an amendment was then adopted requiring that a verdict in favor of the defendant not be set aside on appeal[39] no matter how erroneous the legal theory upon which it might be based.[40] For these purposes, it was made plain that it made no difference whether the verdict be the result of the jury's decision or that of the judge.[41] Moreover, as we explore in more detail later,

[32] See 40 Cong. Rec. 9033.

[33] Id., at 9122.

[34] 41 Cong. Rec. 1865; S. Rep. No. 5650, 59th Cong., 2d Sess. (1907).

[35] 41 Cong. Rec. 2190–2197; 2744–2763; 2818–2825.

[36] Id., at 2194.

[37] Id., at 2195–2197.

[38] See id., at 2749–2762.

[39] See id., at 2819.

[40] See id., at 2752.

[41] When asked whether the substance of his amendment was that there was to be no appeal and retrial after the defendant had been

the debates suggest that apart from decisions arresting judgment, there were to be no appeals taken in any case in which jeopardy had attached by the impaneling of the jury.[42]   Finally, to limit further the scope of the Act to cases of public importance, the Government's right to appeal (under all but the special plea in bar provision) was confined to cases in which the ground of the District Court's decision was the "invalidity or construction of the statute upon which the indictment is founded."[43]

With all these amendments the Senate passed the bill without division on February 13, 1907,[44] but the House, after referring the Senate's version to its Judiciary Committee,[45] disagreed with the Senate bill and proposed a conference.[46]   The conference committee, apart from divesting the courts of appeals of jurisdiction to hear any government appeals, adopted the Senate version of the bill with merely formal changes.[47]   Both the Senate and the House approved the bill reported out by the committee [48] and with the President's signature the Criminal Appeals Act became law.

### B

With this perspective, we now examine the arguments made in opposition to our conclusion.   It is argued in

"acquitted by the verdict of a jury," the sponsor of the amendment, Senator Rayner, stated: "I have in the amendment no such words as 'acquitted by the jury.' I have nothing to do with the jury. He may be acquitted by a magistrate . . . .   I do not care by what tribunal he is acquitted . . . ."   *Id.*, at 2749.

[42] See *infra*, at 302–307.

[43] See 41 Cong. Rec., at 2822, 2823.

[44] *Id.*, at 2834.

[45] *Id.*, at 3044–3047.

[46] *Id.*, at 3647.

[47] See H. R. Rep. No. 8113, 59th Cong., 2d Sess.

[48] 41 Cong. Rec. 3994, 4128.

dissent that § 3731 "contemplates that an arrest of judgment is appropriate in other than a closed category of cases defined by legal history," and concludes that "evidence adduced at trial can be considered by a district court as the basis for a motion in arrest of judgment when that evidence is used solely for the purpose of testing the constitutionality of the charging statute as applied," *post,* at 314 (dissenting opinion of THE CHIEF JUSTICE).

The dissenters propose in effect to create a new procedure—label it a decision arresting judgment—in order to conclude that this Court has jurisdiction to hear this appeal by the Government. The statutory phrase "decision arresting a judgment" is not an empty vessel into which this Court is free to pour a vintage that we think better suits present-day tastes. As we have shown, Congress defined our jurisdiction in the Criminal Appeals Act in terms of procedures existing in 1907. As a matter of interpretation, this Court has no right to give the statutory language a meaning inconsistent with its common-law antecedents, and alien to the limitations that today govern motions in arrest of judgment under Rule 34.[49]

Radical reinterpretations of the statutory phrase "decision arresting a judgment" are said to be necessary in order to effectuate a broad policy, found to be underlying the Criminal Appeals Act, that this Court review important legal issues. The axiom that courts should endeavor to give statutory language that meaning that nurtures the policies underlying legislation is one that

---

[49] It appears that the dissenters have not only "outgrown" the statutory limitations of a "decision arresting a judgment" for purposes of § 3731, but also the limitations of Rule 34.

guides us when circumstances not plainly covered by the terms of a statute are subsumed by the underlying policies to which Congress was committed. Care must be taken, however, to respect the limits up to which Congress was prepared to enact a particular policy, especially when the boundaries of a statute are drawn as a compromise resulting from the countervailing pressures of other policies. Our disagreeing Brothers, in seeking to energize the congressional commitment to review, ignore the subtlety of the compromise that limited our jurisdiction, thereby garnering the votes necessary to enact the Criminal Appeals Act.[50]

In this regard, the legislative history reveals a strong current of congressional solicitude for the plight of a criminal defendant exposed to additional expense and anxiety by a government appeal and the incumbent possibility of multiple trials. Criminal appeals by the Government "always threaten to offend the policies behind the double-jeopardy prohibition," *Will* v. *United States, supra,* at 96, even in circumstances where the Constitution itself does not bar retrial. Out of a collision between this policy concern, and the competing policy favoring review, Congress enacted a bill that fully satisfied neither the Government nor the bill's opponents.[51] For the Criminal Appeals Act, thus born of compromise, manifested a congressional policy to provide review

---

[50] Professor Kurland characterized the statute as "a compromise among several divergent forces. The division in the Senate was primarily between those who wanted limited review and those who wanted none. The division between the House and Senate was between those who wanted complete review and those who wanted limited review." Kurland, *supra,* n. 23, at 454.

[51] See, *e. g.,* 1907 Rep. Atty. Gen. 4. See *infra,* at 306.

in certain instances but no less a congressional policy to restrict it to the enumerated circumstances.

Were we to throw overboard the ballast provided by the statute's language and legislative history, we would cast ourselves adrift, blind to the risks of collision with other policies that are the buoys marking the safely navigable zone of our jurisdiction. As we have shown, what the District Court did in this case cannot be distinguished from a post-verdict acquittal entered on the ground that the Government did not present evidence sufficient to prove that Sisson was insincere. A primary concern of the bill that emerged into law was that no appeal be taken by the Government from an acquittal no matter how erroneous the legal theory underlying the decision. Moreover, going beyond the present case, the theory of those in disagreement would allow a trial judge to reserve to himself the resolution of disputes concerning *facts* underlying a claim that in particular circumstances a speech or protest march were privileged under the First Amendment, a practice plainly inconsistent with a criminal defendant's jury trial rights.

## C

Quite apart from the arresting judgment provision, it is also argued that we have jurisdiction under the "motion in bar" provision of the Criminal Appeals Act. We think it appropriate to address ourselves to this contention, particularly in light of the fact that we asked the parties to brief that issue,[52] even though our holding that the decision below was an acquittal is sufficient to dispose of the case.

---

[52] See 396 U. S. 812 (1969).

300

The case law under the motion-in-bar provision is very confused,[53] and this Court has not settled on a general approach to be taken in interpreting this provision.[54]

[53] At common law, a special plea in bar was ordinarily used to raise three defenses—*autrefois acquit, autrefois convict,* and pardon— and there is language in some of our cases that indicates that, apart from these defenses, a plea in bar was not appropriate "to single out for determination in advance of trial matters of defense either on questions of law or fact," *United States* v. *Murdock,* 284 U. S. 141, 151 (1931). There are cases consistent with the narrow common-law definition that indicate, for example, that a defense based upon the statute of limitations could not be raised by a "special plea in bar," *United States* v. *Kissel,* 218 U. S. 601, 610 (1910); *United States* v. *Barber,* 219 U. S. 72, 78–79 (1911). On the other hand, it appears the Court accepted jurisdiction under § 3731, in appeals from decisions granting special pleas in bar based on a statute of limitations defense, with no explanation of the apparent inconsistency. See *United States* v. *Goldman,* 277 U. S. 229, 236–237 (1928); see also *United States* v. *Rabinowich,* 238 U. S. 78 (1915). And, in *United States* v. *Mersky,* 361 U. S. 431 (1960), there was no decision of the Court on what was a motion in bar, and the concurring opinion of MR. JUSTICE BRENNAN and the dissenting opinion of MR. JUSTICE STEWART indicated disagreement on this issue. Compare 361 U. S., at 441–443 with *id.,* at 455–458. To add to the uncertainty, arguably in *United States* v. *Murdock, supra,* and certainly in *United States* v. *Blue,* 384 U. S. 251, 253–254 (1966), and *United States* v. *Covington,* 395 U. S. 57, 59 n. 2 (1969), the Court took jurisdiction and considered the merits of appeals from district court dismissals based on self-incrimination defenses on the ground that the decisions below had sustained motions in bar for purposes of the Criminal Appeals Act—even though *Murdock* itself stated that this defense is not appropriately raised by a special plea in bar. 284 U. S., at 151.

[54] In *United States* v. *Mersky,* 361 U. S. 431 (1960), there was no decision of the Court concerning what approach should be taken. MR. JUSTICE BRENNAN suggested that the category include any decision that barred reprosecution if upheld, *id.,* at 441–443, while MR. JUSTICE STEWART thought the provision should be confined to those decisions that would fall within the compass of the common law "special plea in bar," *id.,* at 455–458. See generally Kurland, *supra,* n. 23.

Even under the most expansive view, however, a motion in bar cannot be granted on the basis of facts that would necessarily be tried with the general issue in the case.[55] In this case, there can be no doubt that the District Court based its findings on evidence presented in the trial of the general issue. As we have shown earlier, the court's findings were based on Sisson's testimony and demeanor at the trial itself. Moreover, a defense based on Sisson's asserted constitutional privilege not to be required to fight in a particular war would, we think, necessarily be part of the "general issue" of a suit over a registrant's refusal to submit to induction. As THE CHIEF JUSTICE says in his dissenting opinion, "establishing the appropriate classification is actually an element of the Government's case," *post,* at 324, once a defendant raises a defense challenging it. We think a defense to a pre-induction suit based on conscientious objections that require factual determinations is so intertwined with the general issue that it must be tried with the general issue, *United States* v. *Fargas,* 267 F. Supp. 452, 455 (1967) (pretrial motion to dismiss under Rule 12 (b) (1) on the basis of an affidavit, denied because "the validity of the [conscientious objector] defense which Fargas now raises . . . will require the consideration of factual questions which are embraced in the general issue"); see *United States* v. *Ramos,* 413 F. 2d 743, 744 n. 1 (C. A. 1st Cir. 1969) (evidentiary hearing for pre-trial motion to dismiss indictment not appropriate means to consider validity of defense based on conscientious objection because "[q]uestions regarding the validity of

---

[55] The dismissal provision of Fed. Rule Crim. Proc. 12, which MR. JUSTICE BRENNAN in his *Mersky* concurrence saw as having "swept away the old pleas," 361 U. S., at 442, itself limits a dismissal to those defenses "capable of determination without the trial of the general issue," Fed. Rule Crim. Proc. 12 (b) (1).

appellant's classification should have been raised as a defense at the trial," citing *Fargas* with approval).[56]

There is, in our view, still another reason no appeal can lie in this case under the motion-in-bar provision. We construe the Criminal Appeals Act as confining the

[56] Nowhere does *United States* v. *Covington, supra,* suggest, as argued in dissent, that there might be jurisdiction under the motion-in-bar provision of § 3731 in circumstances where the parties "tr[ied] facts to the judge that were relevant to the motion in bar, and separate from the general issue," *post,* at 332 (dissenting opinion of Mr. Justice White). Our Brother White reaches this conclusion by taking a quotation from *Covington* out of context, and confusing that opinion's disposition of the merits of the Government's appeal with the Court's jurisdictional holding.

In *Covington,* the District Court, *before trial without any evidentiary hearing,* dismissed an indictment bottomed on the Marihuana Tax Act, 26 U. S. C. § 4744 (a) (1), on the ground that the "privilege against self-incrimination necessarily would provide a complete defense to the prosecution," *id.,* at 58. The Government appealed, claiming the Court had jurisdiction under both the dismissal and the motion-in-bar provisions of § 3731. The Court found jurisdiction in the alternative under either provision. The only discussion of the motion-in-bar jurisdictional issue, found in a footnote, was as follows: "If the dismissal rested on the ground that the Fifth Amendment privilege would be a defense, then the decision was one 'sustaining a motion in bar.' See *United States* v. *Murdock,* 284 U. S. 141 (1931)," 395 U. S., at 59 n. 2.

Having thus disposed of the jurisdictional issue, the Court proceeded to the merits of the Government's appeal and, *inter alia,* considered "whether such a plea of the privilege [against self-incrimination] may ever justify dismissal of an indictment, and if so whether this is such an instance," *id.,* at 60. In this context the Court said:

"Federal Rule of Criminal Procedure 12 (b) (1) states that: 'Any defense or objection which is capable of determination without the trial of the general issue may be raised before trial by motion.' A defense is thus 'capable of determination' if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense. Rule 12 (b) (4) allows the District Court in its discretion to postpone determination of the motion to trial, and permits factual hearings prior to trial

Government's right to appeal—except for motions in arrest of judgment—to situations in which a jury has not been impaneled, even though there are cases in which a defendant might constitutionally be retried if appeals were allowed after jeopardy had attached. Because the court below rendered its decision here after the trial began, and because that decision was not, as we have shown, an arrest of judgment, we therefore conclude there can be no appeal under the other provisions of § 3731.

---

if necessary to resolve issues of fact peculiar to the motion." *Id.*, at 60.

Taken in full context, the quotation used by MR. JUSTICE WHITE, *post*, at 332, plainly had reference to a district court's power under Fed. Rule Crim. Proc. 12 to dismiss an indictment, and nothing whatsoever to do with the quite distinct issue of the scope of the jurisdictional provisions of § 3731.

That the Court was there concerned with only the merits of appeal is clear from what follows. After suggesting that in most circumstances a motion to dismiss an indictment brought under 26 U. S. C. § 4744 would not require any factual inquiry, the Court stated that once a defendant asserted his privilege a trial court should dismiss the indictment without an evidentiary hearing "unless the Government can rebut the presumption [of nonwaiver of the privilege] by showing a need for further factual inquiries." *Id.*, at 61. In applying that principle to the merits of the case before it, the Court affirmed the District Court's action below because: (1) "there [was] no possibility of any factual dispute with regard to the hazard of incrimination"; and (2) "the Government has never alleged the existence of a factual controversy" concerning the issue of whether "appellee [had] waived his privilege." *Ibid.*

The Court in *Covington* did not say that a defense based on the privilege against self-incrimination where there were facts in dispute could, in all cases, be decided without consideration of the general issue. And, more importantly for present purposes, nowhere does the opinion in *Covington* even hint that a dismissal requiring a pre-trial evidentiary hearing, or a dismissal motion properly deferred to the trial of the general issue would be appealable under the motion-in-bar provision of the Criminal Appeals Act. The Court in *Covington* had no such jurisdictional issues before it, and the opinion does not discuss such issues.

304

We reach this conclusion for several reasons. First, although the legislative history is far from clear, we think it was the congressional expectation that except for motions in arrest—which as we have shown could never be based on evidence adduced at trial—the rulings to which the bill related would occur before the trial began.[57] The language of the motion-in-bar provision

[57] See 40 Cong. Rec. 9033. In this exchange, Senator Spooner said: "I understand this [bill] applies only to questions which arise before the impaneling of the jury." Senator Nelson agreed that the bill was so limited, and obviously thinking he was saying the same thing, said the bill applied only "[w]here the party has not been put in jeopardy." After being reminded of the arrest-of-judgment provision, Senator Nelson acknowledged that this was an exception, but obviously trying to minimize the scope of the exception he pointed out that the only motions in arrest of judgment that could be appealed were those granted "for insufficiency of indictment; not for any other ground." *Ibid.*

See 41 Cong. Rec. 2191 (Sen. Nelson) ("I wish to say further that where a jury has been impaneled and where the defendant has been tried an appeal does not lie"), *id.,* at 2748 (Sen. Patterson) ("[A] motion in arrest of judgment . . . is the only one of the three cases in which there can have been a trial . . . . [I]n the other two cases . . . the motions must ex necessitati be made before jeopardy attaches"); *id.,* at 2752 (Sen. Patterson) ("These proceedings are all defendant's acts *before a verdict* to prevent a trial, except the motion in arrest of judgment, which is defendant's act after a verdict against him to defeat a judgment on the verdict") (emphasis supplied).

Without explaining his inconsistency, Senator Patterson later expressed the view that under the proposed bill the Government would have been able to appeal the decision in the famed Chicago *Beef Trust Case* because the jury's verdict was based on the "special plea in bar filed" in that case, not on the defendants' guilt or innocence, *id.,* at 2753. Underlying this conclusion—later disputed by Senator Nelson, see *id.,* at 2757—was Patterson's expectation that "in the case of a special plea in bar that went against the Government the defendant had not been in jeopardy *on the merits of the case,*" *id.,* at 2753 (emphasis supplied). Unlike the defendants in the *Beef*

itself limits appeals to those granted "when the defend-
ant has not been put in jeopardy." We read that lim-
itation to mean exactly what it says—*i. e.*, no appeal
from a motion in bar is to be granted after jeopardy
attaches. Although the legislative history shows much
disagreement and confusion concerning the meaning of
the constitutional prohibition against subjecting a de-
fendant to double jeopardy [58] there was little dispute over
the then-settled notion that a defendant was put into
jeopardy once the jury was sworn.[59] To read this limi-
tation as no more than a restatement of the constitutional
prohibition, as suggested by MR. JUSTICE WHITE, renders
it completely superfluous. No Senator thought that Con-
gress had the power under the Constitution to provide for
an appeal in circumstances in which that would violate
the Constitution.[60]

Our conclusion draws strength from the fact that the
Government itself has placed exactly this same interpre-

---

*Trust Case*—who Patterson understood not to have been tried on the
general issue of their guilt or innocence—plainly Sisson has been put
"in jeopardy on the merits of the case." Our Brother WHITE admits
as much, by suggesting he could not be retried. Therefore, even
under Patterson's broader reading of the statute, an appeal would
not lie in this case.

[58] See, *e. g.*, 41 Cong. Rec. 2745–2763.

[59] See, *e. g.*, 40 Cong. Rec. 9033; 41 Cong. Rec. 2192; *id.*, at 2751.

[60] See 41 Cong. Rec. 2751 (Sen. Knox) ("[I]f I thought there
was a single line, or a sentence, or a clause contained in this bill
which by any court would be construed to place a man twice in
jeopardy, I would vote to cut it out, not because there would be any
necessity for cutting it out, as it would be invalid under the Consti-
tution of the United States, but I would vote to cut it out upon the
ground that it would not be an artistic and intelligent bill with such
a provision within its borders.")

The provision granting an appeal from a decision dismissing
or setting aside an indictment does not contain a similar phrase
limiting appeals to cases where the defendant has not yet been put
in jeopardy, but we agree with the conclusion reached by the Gov-
ernment that the same limitation applies. See n. 57, *supra.*

tation on the Act. The Department of Justice, the agency for whose benefit the original bill was enacted, first placed this construction on the statute shortly after the bill was enacted, and has consistently abided by it in the more than 60 years that have since passed. As the Solicitor General stated in his brief:

"The Department of Justice has consistently taken the view that the plea in bar section limits the government's right of appeal to the granting of such pleas before a jury has been sworn. Soon after passage of the original Act, the 1907 Report of the Attorney General urged that the omission in the Act of a governmental right to appeal from post-jeopardy rulings be remedied by revising the Act so as to require counsel for the defendant to raise and argue questions of law prior to the time when jeopardy attached," Brief 17.

Later, after describing the opinion in *Zisblatt, supra,* in which the Second Circuit certified an appeal to this Court to determine whether the phrase "not been put in jeopardy" merely incorporated the constitutional limitation, or instead should be taken literally, the Government's brief states:

"The then Solicitor General, being of the view that the statute barred appeals from the granting of motions in bar after jeopardy had attached, moved to dismiss the appeal, and the appeal was dismissed (336 U. S. 934). The Department of Justice has thereafter adhered to that position, and the government has never sought to appeal in these circumstances."[61]

This interpretation in our view deserves great weight.

---

[61] Brief 19. It should be noted that at the Government's request a proposed amendment to § 3731 has been introduced in

In light of (1) the compromise origins of the statute, (2) the concern with which some Senators viewed the retrial of any defendant whose trial terminated after the jury was impaneled, and (3) the interpretation placed on the Act shortly after its passage [62] that has been consistently followed for more than 60 years by the Government, we think that the correct course is to construe the statute to provide a clear, easily administered test: except for decisions arresting judgment, there can be no government appeals from decisions rendered after the trial begins.

## IV

Clarity is to be desired in any statute, but in matters of jurisdiction it is especially important. Otherwise the courts and the parties must expend great energy, not on the merits of dispute settlement, but on simply deciding whether a court has the power to hear a case. When judged in these terms, the Criminal Appeals Act is a failure. Born of compromise, and reflecting no coherent allocation of appellate responsibility,[63] the Criminal Appeals Act proved a most unruly child that has not improved with age. The statute's roots are grounded in pleading distinctions that existed at common law but

---

Congress to remove this limitation. The proposed statute, which avoids common-law terminology, would allow an appeal from a decision made after the jury was sworn in all cases where the Double Jeopardy Clause would permit it. See H. R. 14588, 91st Cong., 1st Sess., 115 Cong. Rec. H10274 (daily ed. Oct. 29, 1969).

[62] See 1907 Rep. Atty. Gen. 4; see also Hearing on Granting Appeals by the United States from Decisions Sustaining Motions to Suppress Evidence, before Subcommittee No. 2 of the House Committee on the Judiciary, 83 Cong., 2d Sess., ser. 15, p. 11 (1954).

[63] Motions in bar, for example, can only be appealed to this Court irrespective of whether the case involves the validity or construction of a statute.

which, in most instances, fail to coincide with the procedural categories of the Federal Rules of Criminal Procedure. Not only does the statute create uncertainty by its requirement that one analyze the nature of the decision of the District Court in order to determine whether it falls within the class of common-law distinctions for which an appeal is authorized,[64] but it has also engendered confusion over the court to which an appealable decision should be brought.[65]

The Solicitor General, at oral argument in this case, forthrightly stated that "there are few problems which occur so frequently or present such extreme technical difficulty in the Solicitor General's office [as] in the proper construction of the Criminal Appeals Act." [66] We share his dissatisfaction with this statute. Nevertheless, until such time as Congress decides to amend the statute, this Court must abide by the limitations imposed by this awkward and ancient Act.

We conclude that the appeal in this case must be dismissed for lack of jurisdiction. *It is so ordered.*

MR. JUSTICE BLACK concurs in the judgment of the Court and Part II C of the opinion.

MR. JUSTICE BLACKMUN took no part in the consideration or decision of this case.

MR. CHIEF JUSTICE BURGER, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE WHITE join, dissenting.

Both the Government and Sisson have argued that this Court has jurisdiction to review the District Court's

---

[64] See *supra,* nn. 53–54.

[65] See, *e. g., United States* v. *Zisblatt, supra; United States* v. *Brodson,* 234 F. 2d 97 (C. A. 7th Cir. 1956). See generally Friedenthal, *supra,* n. 9, at 83–88.

[66] Tr. of Oral Arg. 11.

action by virtue of the "arrest of judgment" clause in the Criminal Appeals Act, 18 U. S. C. § 3731, which provides for a direct appeal to this Court

"[f]rom a decision [1] arresting a judgment of conviction [2] for insufficiency of the indictment or information, [3] where such decision is based upon the invalidity or construction of the statute upon which the indictment or information is founded."

In rejecting the arguments of the parties the Court holds that we have no jurisdiction to hear this appeal, opting for the view that the "arrest of judgment" clause carries with it all of its common-law antecedents and that the present case does not meet the criteria required by the common law. My disagreement with the Court's result and rationale is prompted by a fundamental disagreement with the Court's mode of analysis and its excessive reliance on ancient practices of common-law England long superseded by Acts of Congress.

Section 3731 appears to set three requirements for jurisdiction in this Court: (1) the decision from which the appeal is taken must be one "arresting a judgment of conviction"; (2) the decision must be engendered by the "insufficiency of the indictment or information"; and (3) it must be "based upon the invalidity or construction of the statute upon which the indictment or information is founded."

I

The first requirement, that the decision from which the appeal is taken must be one "arresting a judgment of conviction," can without undue violence to its language be construed as being encrusted with the lore of centuries of common-law jurisprudence, and the Court has so construed it. The form of an "arrest of judgment" was well established at an early date in the common law's development; Blackstone was able to describe a clearly defined motion in arrest as a device that was proce-

durally appropriate after the guilty verdict had been rendered but before the judge had imposed sentence. The court, in an early form of permitting allocution, traditionally asked the prisoner if he had "anything to offer why judgment should not be awarded against him." 4 W. Blackstone, Commentaries *375. The prisoner could then respond by offering exceptions to the indictment, "as for want of sufficient certainty in setting forth either the person, the time, the place, or the offence." *Ibid.* If the prisoner was successful, the court entered an arrest or stay of the judgment. Also, under the common law, it was settled that "the Court ought not to arrest judgments upon matters not appearing upon the face of the record; *but are to judge upon the record itself,* that their successors may know the grounds of their judgment." *Sutton* v. *Bishop,* 4 Burr. 2283, 2287, 98 Eng. Rep. 191, 193 (K. B. 1769) (emphasis added). The record included "nothing more than the judgment roll; and indeed, the common-law knew nothing of the evidence taken at a trial until the Statute of Westminster allowed exceptions to be sealed and a bill of exceptions to be brought up with the roll on writ of error." *United States* v. *Zisblatt,* 172 F. 2d 740, 741–742 (C. A. 2d Cir.) (L. Hand, C. J.), appeal dismissed on Government's motion, 336 U. S. 934 (1949).

Much, if not all, of the common-law learning was transplanted to the United States. As early as 1807, the Court recognized the existence of the motion in *United States* v. *Cantril,* 4 Cranch 167 (1807). And, in 1820, Chief Justice Marshall stated for the Court that "judgment can be arrested only for errors apparent on the record . . . ." *United States* v. *Klintock,* 5 Wheat. 144, 149 (1820). See also *Carter* v. *Bennett,* 15 How. 354 (1854); *Bond* v. *Dustin,* 112 U. S. 604 (1884).

Whether § 3731's requirement of an arrest of judgment incorporates the common-law jurisprudence, or

whether it is viewed as simply looking to the standards of Rule 34, Fed. Rules Crim. Proc.,[1] the Court has indicated that it believes that the decision of the District Court here was not one "arresting a judgment" because it was based on evidence adduced at the trial, notwithstanding the precise—and I suggest, purposeful, delineations of an astute District Judge quite as familiar with history and the background of this statute as are we.

The Solicitor General also has conceded that § 3731 uses the term "arrest of judgment" in its common-law sense. However, he has sought to avoid the inescapable implications of this concession by arguing that the District Court, "in granting appellee's motion, did not base its action wholly on the allegations of the indictment, but used as a partial predicate for its constitutional rulings the undisputed fact, which appeared from the evidence at trial, that appellee is a non-religious conscientious objector to participation in the Vietnam conflict."[2] The Solicitor General's argument in favor of jurisdiction seeks to avoid the District Court's reliance on evidence by pointing out that the District Court's decision did not purport to be a judgment on the merits, *i. e.,* that the evidence was not sufficient to show that appellee committed the offense charged, and thus was not a directed acquittal. He submits that the District Court used Sisson's sincere, nonreligious form of conscientious

---

[1] *United States* v. *Lias,* 173 F. 2d 685 (C. A. 4th Cir. 1949), supports the view that the standards are the same for Rule 34 and § 3731.

Rule 34 provides: "The court on motion of a defendant shall arrest judgment if the indictment or information does not charge an offense or if the court was without jurisdiction of the offense charged. The motion in arrest of judgment shall be made within 7 days after verdict or finding of guilty, or after plea of guilty or *nolo contendere,* or within such further time as the court may fix during the 7-day period."

[2] Brief 30.

objection to a particular war as the basis for its ruling that the indictment was constitutionally infirm *as applied to Sisson.* Since the evidence of conscientious objection was undisputed at trial [3] and is undisputed now, the Solicitor General argues that the use of the facts here was akin to a stipulation of facts by parties in a criminal case, and that this Court has recognized that such a stipulation may be treated by the District Court as supplementing the indictment (like a bill of particulars). He relies on *United States* v. *Halseth,* 342 U. S. 277 (1952), and *United States* v. *Fruehauf,* 365 U. S. 146 (1961).[4]

---

[3] As the Court's opinion indicates, see *ante,* at 274–276, the evidence of conscientious objection that was admitted at trial was subject to cross-examination and was discussed during the closing arguments, but solely in the context of Sisson's "wilfulness" in refusing induction, not respecting whether Sisson was or was not in fact a sincere conscientious objector.

[4] Both the *Halseth* and *Fruehauf* cases involved dismissals of indictments *before* trial. In *Halseth* the parties had entered into a stipulation *for purposes of a motion to dismiss.* The indictment charged in the words of the statute an unlawful use of the mails to deliver "a lottery or scheme." It was stipulated that the particular lottery involved would come into existence only if the addressee put the paraphernalia into operation. The District Court granted a motion to dismiss on the ground that the statute did not apply to lotteries such as defendant's that were not yet in existence. This Court affirmed, necessarily relying on the particular facts about the particular mailing under attack. See 342 U. S., at 280–281. In *United States* v. *Fruehauf,* 365 U. S. 146 (1961), the indictment charged the appellant, again in the words of the statute, with unlawfully delivering money to a union representative. The District Court ruled that a trial memorandum filed by the Government constituted a judicial admission that a transaction at issue was a loan and concluded that the statute did not cover a loan. The Government appealed that construction of the statute. The Court refused to consider that the "admission" had clearly foreclosed the Government from proving at trial that the loan was a sham or otherwise constituted a transfer of something of

My disagreement with the Court is based upon much more fundamental grounds than those which the Solicitor General would use to avoid the strictures of the common-law concept of an arrest of judgment. In my view the Criminal Appeals Act contemplates that an arrest of judgment is appropriate in other than a closed category of cases defined by legal history. Specifically, there is no reason for the Court today to read into that

value apart from an ordinary loan, thus violating the statute. Accordingly, it refused to pass on the merits of the appeal and remanded the case for a trial on the existing indictment.

*Halseth* and *Fruehauf* are inconclusive authorities on the issue of whether a stipulation can supplement an indictment and generate a basis for review under § 3731. While the majority recognizes that the issue has not been resolved, and although it purports not to resolve it here, it does rely on *United States* v. *Norris*, 281 U. S. 619 (1930), and a policy of construing the Criminal Appeals Act narrowly to express doubt that the Solicitor General's argument should be accepted.

*Norris,* however, is not a persuasive precedent. There the defendant was permitted to enter a plea of *nolo contendere* to the charge contained in the indictment. When he appeared for sentencing, a stipulation of facts was filed, and he then submitted a motion for arrest of judgment which relied on the stipulation. The District Court denied the motion but the Court of Appeals reversed, concluding that the indictment was insufficient in light of the stipulation. This Court in turn reversed the Court of Appeals, holding that after pleading guilty, a defendant may not then stipulate facts to test the constitutionality of his conviction. There was no suggestion that an appeal would not lie where a statute was held unconstitutional as applied to stipulated facts. Indeed, the Court's opinion seems at one point to suggest that if the defendant had withdrawn his plea, and then questioned the constitutionality of his conviction on stipulated facts, the question would have been open to consideration. 281 U. S., at 623.

Further, the majority's ultimate conclusions about the Act necessarily lead it into uncomfortable distinctions. For if the Government or the parties want a constitutional ruling about the applicability of a statute to a particular set of facts, it is only necessary to set out those facts as a part of the indictment or information.

class of cases all of the niceties of what might or might not have been included in the "judgment roll" at common law. We have outgrown those formalisms.

I conclude that evidence adduced at trial can be considered by a district court as the basis for a motion in arrest of judgment when that evidence is used solely for the purpose of testing the constitutionality of the charging statute as applied. I do so because the legislative history surrounding the passage of the Criminal Appeals Act abundantly shows Congress contemplated review by this Court in such a case. The reasons for the Court's face-of-the-record limitation, in the technical common-law form of an arrest of judgment, have long since disappeared, and the Court's reliance on a policy disfavoring appeals under the Criminal Appeals Act is misplaced.

The Court's reasoning pays scant attention to the purpose of the Criminal Appeals Act and to the problem that Congress was attempting to solve in 1907 when the Act was passed. The legislative history of the Criminal Appeals Act reflects the strong desire by a number of Attorneys General of the United States for an appellate remedy in selected criminal cases.[5] Such a remedy had been provided in England and in some States, but the lack of such a remedy for the Federal Government had "left all federal criminal legislation at the mercy of single judges in the district and circuit courts. This defect became all the more serious because it became operative just at the beginning of the movement for increasing social control through criminal machinery." [6] Congress, however, was not stirred to complete its action on the

---

[5] See Kurland, The *Mersky* Case and the Criminal Appeals Act: A Suggestion for Amendment of the Statute, 28 U. Chi. L. Rev. 419, 446–449 (1961).

[6] F. Frankfurter & J. Landis, The Business of the Supreme Court 114 (1928).

proposals until a federal district court rendered its decision in *United States* v. *Armour & Co.,* 142 F. 808 (D. C. N. D. Ill. 1906), sustaining a motion to dismiss and ending a Sherman Act prosecution in which President Theodore Roosevelt had a great interest.

The House passed, without debate, a bill that gave the United States in all criminal prosecutions "the same right of review by writ of error that is given to the defendant," provided that the defendant not twice be put in jeopardy for the same offense. 40 Cong. Rec. 5408 (1906). The Senate, however, refused to accept the House bill. Rather, its Judiciary Committee offered as a substitute a more complicated bill which ultimately was refined to become the Criminal Appeals Act. In relevant part, the substitute would have allowed a writ of error by the United States "[f]rom the decision arresting a judgment of conviction for insufficiency of the indictment." S. Rep. No. 3922, 59th Cong., 1st Sess. (1906). When the substitute came to the floor of the Senate, the floor leader for the bill, Senator Knute Nelson of Minnesota, explained the need for the legislation in constitutional terms: "[S]ometimes an indictment is set aside on the ground that the law under which the indictment was found is held to be unconstitutional. *The object* [of this bill] *is to allow the Government to take the case up and get a ruling of the Supreme Court.*" 40 Cong. Rec. 8695 (1906) (emphasis added). The bill was then put over in the absence of unanimous consent for consideration. When the bill returned to the floor, questions were raised with respect to the arrest of judgment provision regarding the prohibition against double jeopardy. Unanimous consent to proceed again was withdrawn and the bill was again put over. 40 Cong. Rec. 9033 (1906).

An amended bill was reported out of committee in January of 1907. When this bill reached the floor, a

spirited three-day debate took place respecting its impact on an accused. Indeed, among the questions discussed was whether a defendant who succeeded on a motion in arrest of judgment could again be prosecuted. See 41 Cong. Rec. 2192–2193 (1907). But almost none of the debate concerned the scope of an "arrest of judgment." Senator Knox, who had been the Attorney General before going to the Senate, did say that "this legislation is along the line of the law as it is understood in England under the common law." 41 Cong. Rec. 2751 (1907). However, this statement apparently referred to the right of the Government to appeal, for it was immediately followed by the observation: "In England the Crown always had the right to an appeal in a criminal case. In my own State since its foundation the right has been conceded." *Ibid.* The manifest, overriding concern of the Senate was with enacting legislation that would permit appeals as to important *legal* questions always subject to the bar against double jeopardy,[7] and this concern carried over to the arrest of judgment provision.[8] Indeed, the major limiting amendment adopted by the Senate restricted the right of review by the Government in criminal cases to constitutional issues and questions of construction of the statute under which the charge was brought. See 41 Cong. Rec. 2819–2820 (1907).

---

[7] "The Government takes the risks of all the mistakes of its prosecuting officers and of the trial judge in the trial, and it is only proposed to give it an appeal upon questions of law raised by the defendant to defeat the trial and if it defeats the trial." 41 Cong. Rec. 2752 (1907) (remarks of Senator Knox).

[8] "[A motion in arrest of judgment] is a case in which the defendant has been tried, in which he has been found guilty on the merits of the case, and by reason of some technicality, if I may use the term in its broad sense, the hand of the court is arrested from imposing the penalty upon him." 41 Cong. Rec. 2753 (1907) (remarks of Senator Patterson).

Another illustration of what the Senate thought it was doing in describing this category of appeals comes from the emphasis on distinguishing a "motion in arrest" from an "acquittal." See 41 Cong. Rec. 2748 (1907). From the latter, to be sure, there was to be no appeal—no matter how many errors the trial judge had committed along the way to the acquittal in the form of erroneous rulings or other trial errors. As the majority has noted, an amendment was adopted which required that *verdicts* in favor of the defendant could not be set aside on appeal. 41 Cong. Rec. 2819 (1907). The text of the amendment as adopted read: *"Provided,* That if upon appeal or writ of error it shall be found that there was error in the rulings of the court during the trial, a verdict in favor of the defendant shall not be set aside." *Ibid.* The proponent of the amendment, Senator Rayner, expressed the view that the amendment was directed toward a *"verdict of not guilty,* whether by the court or the jury . . . ." ˥1 Cong. Rec. 2747 (1907) (emphasis added). Here, of course, Sisson was not acquitted but was found guilty by the jury. Further, the Court's use of the Rayner amendment to support a narrow reading of the "arrest of judgment" provision is incongruous in the extreme in light of the fact that the amendment had no substantive effect and was later deleted from the Act. See MR. JUSTICE WHITE's opinion, *post,* at 344 n. 11.

"Trial errors" respecting the fact-finding function—which affect only the particular trial—were distinguished from errors of law that had been separated from the trial on the merits, and that involved constitutional rulings that could affect future attempts of the Government to prosecute under the same statute:

> "The defendant gets the benefit of all errors in the trial which are in his favor, and can challenge all errors in the trial which are against him. It is

certainly not too much when he attacks the trial itself or the law under which it is conducted to give the people the right to a decision of their highest courts upon the validity of statutes made for their protection against crime." 41 Cong. Rec. 2752 (1907) (remarks of Senator Knox).

"The motion in arrest of judgment can only be made—it is wholly inapplicable to any other condition than that of conviction—to a verdict of guilty. It is interposed after a verdict of guilty and before judgment for an alleged legal reason that will arrest the court in pronouncing judgment upon the verdict." 41 Cong. Rec. 2753 (1907) (remarks of Senator Patterson).

The Senate passed the bill with the acquired floor amendments on February 13, 1907. 41 Cong. Rec. 2825 (1907). The House insisted on a conference, but the conference committee adopted the Senate version. The resulting conference committee bill was ultimately adopted. 41 Cong. Rec. 3994, 4128 (1907).

Notably, the debates on the Senate bill which formed the basis of the Act demonstrate a total lack of concern with the technical niceties of ancient common-law forms of pleading. And, far from distinguishing cases where a congressional act was invalidated on its face from cases where it was invalidated as applied to a situation that Congress clearly intended to reach, the debates appear to contemplate both cases as appropriate for appeal to this Court—certainly the evil aimed at—and the rationale of the Act is broad enough to encompass both situations. Appeal was to be for the purpose of deciding "constitutional questions," "questions of law" which, if the district judge's decision were permitted to stand, could lead to conflict and different treatment under the same

criminal statutes in different parts of the country, with
no opportunity under existing law for resolution in this
Court. The Government was to have a chance to "set-
tle the law as to future cases *of like character."* 41
Cong. Rec. 2194 (1907) (emphasis added).

It is difficult to imagine a case more closely fitting
into this rationale than that now before us. The class
of nonreligious conscientious objectors is not likely to
be a small one. Indeed under the impetus of this hold-
ing it is likely to grow. Yet whether or not a member
of that class can constitutionally be punished for refusing
to submit to induction now depends on where that per-
son is tried and by whom. That one district judge
may entertain a different view of the Constitution than
does another is an extraordinary reason for differing
results in cases that rationally ought to be decided the
same way—and with appellate review available to insure
that end. The conclusion that this is not a "motion
in arrest," insulates the judge's constitutional decision
from review anywhere—here or in the Court of Ap-
peals. That, I submit, is precisely the situation Con-
gress thought it was correcting with the Criminal Ap-
peals Act. It is remarkable that the Court finds it so
easy to ignore the explicit and meaningful legislative
history which refutes its strained reading of the statute
and history.

The common-law rule that an arrest of judgment could
be based on nothing more than the judgment roll seems
to have been required by the existence of the very limited
record of that day which did not include the evidence
adduced at trial. Evidentiary matters were not before
the appellate courts, and it would have been impossible
for the arresting court's "successors [to] know the
grounds of their judgment," *Sutton* v. *Bishop, supra,* if
the arresting court considered the evidence at trial. This

Court in this case obviously has no such problem in providing appellate review. The records before us contain complete transcripts of the trial proceedings as a matter of course.

Accordingly, while the District Court admittedly looked to evidence, including demeanor evidence, for its findings that Sisson was "sincere" and was "genuinely and profoundly governed by his conscience," this use for that purpose should not now bar this Court from considering the District Court's action as an arrest of judgment. As long as the evidence was used to test the constitutionality of the charging statute as applied to the defendant, *and not to test the sufficiency of the proof against the allegations in the indictment,* the use of the evidence was consistent with the purposes of an arrest of judgment.

In this case, there has been no finding that Sisson did not commit the acts charged; there has been only a holding by the trial judge that his acts were constitutionally protected—a holding that stands as the sole impediment to imposing a jury verdict of guilty; no verdict of acquittal was ever returned. Even our present Federal Rules of Criminal Procedure make a similar distinction between a "Motion for Judgment of Acquittal," Rule 29, and an "Arrest of Judgment," Rule 34. The former is entered "if the evidence is insufficient to sustain a conviction" of the offense charged, while the latter is granted where the indictment "does not charge an offense" at all. Rule 29 allows a judge to reserve his decision on a motion for judgment of acquittal until after the jury has returned a verdict. If he then grants the motion, the defendant stands acquitted, but again only because *the evidence* has been found insufficient to support the charge. Where the grounds for granting an "acquittal" are based on an independent legal deci-

sion about the interpretation or construction of the statute, the judge's action will be an "arrest of judgment" even though he labels it an "acquittal." *United States* v. *Waters,* 84 U. S. App. D. C. 127, 175 F. 2d 340 (1948).

I cannot believe that Congress, fully aware that no appeal was available for a directed verdict or judgment *n. o. v.,* contemplated that this form of judicial action should be accorded the same nonappealable status. Moreover, the sophisticated District Judge could have entered a judgment *n. o. v.* if he wanted to *avoid* review or if he thought that he was indeed passing on the sufficiency of the evidence to meet the allegations of the indictment. Of course, his views are not controlling, but I am comforted by his appraisal and quite satisfied he knew precisely what he was doing—or thought he did on the assumption that his action was reviewable under well-established principles the Court now ignores.

The Court also inveighs against a "broad" construction of the Act, noting that this Court has denominated an appeal by the Government in a criminal case as an "exceptional right," and as "something unusual, exceptional, not favored." *Ante,* at 291. This is an odd characterization; the right is precisely as "exceptional" or "unusual" as Congress makes it. This Court has no power to define the scope of its own appellate review in this context and a subjective distaste for review at the instance of government has no proper place in adjudication. The tendency to be miserly with our jurisdiction did not prevent our construing the three-judge court acts to include cases where statutes were held unconstitutional as applied, *Query* v. *United States,* 316 U. S. 486 (1942); C. Wright, Federal Courts 190 (2d ed.. 1970), and it should not carry any more weight in assessing our responsibility to decide the constitutional issues in this

case,[9] the more so when it is a constitutional holding of great moment.

## II

The second requirement, that the decision of the District Court must rest upon the "insufficiency of the indictment," also presents a difficult question here. The Court emphasizes, wrongly, in my view, that both grounds upon which the District Court's decision rests are defenses that Sisson successfully asserted. In an ordinary case, an indictment, to be sufficient, need not anticipate affirmative defenses. This, however, is not the ordinary case. The indictments in cases of this nature typically charge only that the Selective Service registrant

> "did unlawfully, knowingly and wilfully fail and neglect and refuse to perform a duty required of him under and in the execution of the Military

---

[9] The one case in which this Court has even tangentially considered whether evidence adduced at trial can ever be considered as the basis of a motion in arrest of judgment was *United States* v. *Green,* 350 U. S. 415 (1956). There the majority of the Court was impelled to explain the basis for its decision by explicitly pointing out that "the record does not contain the evidence upon which the [district] court acted. . . . We rule only on the allegations of the indictment . . . ." 350 U. S., at 421. MR. JUSTICE DOUGLAS, with whom Chief Justice Warren and MR. JUSTICE BLACK joined, dissented on the ground that the District Court's "order granting the motions in arrest of judgment rested at least in part upon the insufficiency of the evidence to support the conviction." *Ibid.* But neither the position adopted by the majority nor that taken by the dissenters in *Green* is remotely dispositive of the present case. Here, in contradistinction to the dissenters' view of the circumstances in *Green,* evidence adduced at trial was used by the District Court solely for the purpose of testing the constitutionality of a statute as applied; the District Court's opinion concedes the sufficiency of the evidence to sustain the verdict *if the constitutional views expressed in the opinion are not sustained.*

Selective Service Act of 1967 and the rules, regulations and directions duly made pursuant thereto, particularly 32 Code of Federal Regulations 1632.14, in that he did fail and neglect and refuse to comply with an order of his local draft board to submit to induction into the armed forces of the United States; in violation of Title 50, Appendix, United States Code, Section 462." [10]

Yet this allegation subsumes in its terse language a myriad of elements that the Government may be called upon to prove if the defense makes an appropriate challenge. Prosecutions for refusing to submit to induction are unusual because they incorporate into the judicial proceeding much that has occurred in the administrative processes of the Selective Service System. All of the courts of appeals have compensated for the administrative proceedings by holding that the Government need not plead and prove many elements that would normally be a part of its case-in-chief. The courts of appeals have devised a presumption of regularity which attaches to the official acts of the local boards that, standing alone, is sufficient to preclude reversal of a conviction when a given element is not raised at trial. See particularly *Yates* v. *United States,* 404 F. 2d 462 (C. A. 1st Cir. 1968) (presumption of regularity attaches to the order-of-call requirement). However, if the defendant succeeds in making a *prima facie* case against the presumption, the Government is put to its proof on the particular element of the offense. See *United States* v. *Baker,* 416 F. 2d 202 (C. A. 9th Cir. 1969).

By analogy, the Government is not required to plead and prove that the defendant was properly classified in category I-A as available for induction. Rather, the

---

[10] App. 6.

defendant can challenge the classification at trial if he has preserved his claim, and force the Government to prove that there was indeed a "basis in fact" for the classification. Thus, establishing the appropriate classification is actually an element of the Government's case, but because of the deference given to the administrative process that preceded the criminal proceedings, the Government has been excused from pleading and proving it in the indictment. Since the general allegations in the indictment actually do subsume the element that the District Court held was based on an invalid statute as applied to Sisson, that court's decision was based on the "insufficiency of the indictment" within the meaning of § 3731.

The Court also appears to assume that an indictment may be "insufficient" because the acts charged cannot constitutionally be made an offense, *e. g.*, where they show the existence of a constitutional privilege that bars conviction. But, the Court concludes that "this indictment . . . does not allege facts that themselves demonstrate the availability of a constitutional privilege." *Ante,* at 288.

In my view, the Court's suggestion is simply the same argument, differently approached, as the argument that a motion in arrest can be based only on facts appearing on the face of the record. In both cases, the single question, as I see it, is whether Congress drew a distinction for purposes of appeal by the Government, between cases in which the district court found the entire statute unconstitutional, and cases in which the court found the statute unconstitutional as applied.

The view has been expressed that the Criminal Appeals Act is badly drawn and gives rise to a multitude of problems. We can all agree as to the infirmities of the statute but this is hardly an excuse to take liberties with its plain purposes reasonably articulated in its terms. Prior

urgings addressed to the Congress to correct this situation have gone unheeded. But the Court's holding today is a powerful argument to spur corrective action by Congress.

MR. JUSTICE WHITE, with whom THE CHIEF JUSTICE and MR. JUSTICE DOUGLAS join, dissenting.

I

I agree with THE CHIEF JUSTICE that this case can be appealed by the Government under the "motion in arrest" provision of the Criminal Appeals Act. In contrast to the rather clear remedial purpose of the Act, not a single passage in the legislative history indicates awareness by Congress that the words it was using had the effect of distinguishing cases where a congressional Act was held invalid on its face from cases where it was invalidated as applied to a sub-class within the Act's intended reach. In both cases, the indictment is "insufficient" to state a valid offense.[1] In both cases, any "factual findings" necessary to give the particular defendant the benefit of the constitutional ruling are little more than findings as to the defendant's standing to raise the constitutional issue—they are not findings as to the sufficiency of the evidence to prove the offense alleged in the indictment.[2] Thus, if Judge Wyzanski, without making any findings as to Sisson's sincerity, had held

[1] Failure to set out the elements of a *valid* offense against the named defendant is the only way an indictment could ever be "insufficient" because of the unconstitutionality (as opposed to the construction) of the underlying statute.

[2] The majority, as THE CHIEF JUSTICE's opinion makes clear and as I discuss in more detail later, *infra*, at 331–332 and n. 6, 332–334, repeatedly ignores this difference between the facts necessary to secure relief for Sisson on his constitutional claim, and the facts relevant to the offense of wilfully refusing induction.

the Selective Service Act unconstitutionally overbroad because it purported to subject to the draft in violation of the Free Exercise Clause sincere, nonreligious objectors, this Court would clearly have jurisdiction and would face the question whether Sisson could raise the claim without showing that he was a member of the allegedly protected class. Cf. *Thornhill* v. *Alabama,* 310 U. S. 88 (1940). If such a showing had to be made, as the judge here held it did, the question of standing and the facts relevant to that question are surely distinct from the question of whether the defendant committed the offense, or the question of the validity *vel non* of the statute.[3] Cf. *Association of Data Processing Service Organizations* v. *Camp,* 397 U. S. 150 (1970); *Barlow* v. *Collins,* 397 U. S. 159 (1970).

## II

We asked the parties in this case to consider whether 18 U. S. C. § 3731 confers jurisdiction on the ground that the lower court had sustained "a motion in bar, when the defendant has not been put in jeopardy." The majority, after a lengthy discussion of the "motion in arrest" provision, condescends to address a few remarks to this question, with the suggestion that it really need not discuss the issue at all, since it has concluded that Judge Wyzanski's action amounted to "an acquittal." As MR.

---

[3] The majority seems to recognize that it would have difficulty justifying a refusal to hear an appeal challenging Judge Wyzanski's ruling on the Establishment Clause, simply because findings had to be made as to the defendant's standing to raise the issue. See *ante,* at 284 n. 16. But there is no real difference in this respect between Judge Wyzanski's free exercise and establishment rulings: both— as the majority concedes, *ibid.*—require factual determinations that Sisson belongs to the class that is entitled to raise the constitutional claim that is being asserted. If the ruling on the first is "an acquittal," so is the ruling on the second, since the judge *might have* sent the establishment issue to the jury too. See *infra,* at 327–328.

JUSTICE BLACK's concurrence indicates, the lengthy discussion of the "motion in arrest" provision is equally superfluous if indeed it is so clear that Sisson has been "acquitted." In reality, the bald assertion that Sisson has been "acquitted" simply begs the matter at issue: until one knows what a "motion in bar" is, as well as a "motion in arrest," and how the granting of such motions differs from granting a judgment of acquittal, one cannot confidently attach any label to Judge Wyzanski's action.

The only reason the majority gives for concluding that Sisson has been acquitted is based, not on what actually happened, but on what *might have* happened. Since Judge Wyzanski *could have* submitted the case to the jury on instructions reflecting his view of the law, and since the jury so instructed *could have* returned a verdict of "not guilty," therefore we must pretend that that is what has actually happened. That suggestion is nonsense. One does not determine "what in legal effect [Judge Wyzanski's decision] actually was," *ante*, at 279 n. 7, by asking "what in legal effect the decision might have been." If that were the key question, then this Court should not have had jurisdiction in *United States v. Covington*, 395 U. S. 57 (1969) (HARLAN, J.). There the trial judge accepted the defendant's argument that the Fifth Amendment prevented the Marihuana Tax Act from constitutionally being applied to him. Under the majority's view, that action would amount to an acquittal because the judge *might have* given the case to the jury under instructions that it should acquit if it found the facts necessary to sustain the defendant's privilege—*e. g.*, that he was not one of the registered marihuana dealers whose conduct was legal under state law. Indeed, if applied consistently the majority's theory would mean that there is no case that could be appealed to this Court under the

"motion in bar" provision of the Criminal Appeals Act. For it will always be true that a judge *might have* sent the case to the jury under instructions reflecting his view that the motion in bar was good, so that if the jury found the facts relied on in the motion, it should acquit.[4]

---

[4] Consistently applied, the majority's theory would make no criminal case appealable to this Court. For even where a judge dismisses an indictment or grants a motion in arrest because of defects "on the face of the record," it is always true that he *might have* sent the case to the jury, instructing it to acquit if it found the facts alleged in the indictment, thus insulating the case from review because of the intervening jury acquittal.

The majority's protest that its conclusion does not rest on "what might have happened," *ante,* at 290 n. 19, simply serves to highlight the *ipse dixit* nature of its opinion. For the plain fact is that no other reason is ever given to explain why Judge Wyzanski's action amounted to a post-verdict directed acquittal. The question in this case is whether an affirmative defense, relying on facts developed at trial and sustained by the trial judge after a jury verdict of guilty, can amount to an appealable "motion in bar." It is no answer to this question simply to repeat that this is a case in which Judge Wyzanski after a verdict of guilty sustained Sisson's defense on facts developed at the trial—a clearer case of question-begging can hardly be imagined. Such a simple restatement only poses the question that is to be decided: does such action amount to a nonappealable "acquittal" and, if so, why?

One answer to this question is suggested by the majority in its citation to *United States* v. *Ball, ante,* at 289–290. An acquittal is the type of judgment that cannot be reviewed without putting the defendant twice in jeopardy for the same offense in violation of the Constitution. Indeed, the legislative history shows that Congress was well aware of the *Ball* decision, and strongly suggests that Congress thought that nonappealable "acquittals" were only those in which review was incompatible with the double jeopardy provisions of the Fifth Amendment. See, *e. g.,* 41 Cong. Rec. 2193. But despite the citation, I cannot believe that the majority really means to suggest that Congress could not constitutionally authorize an appeal in a case precisely parallel to this one in accordance with currently sought legislation. That would indeed be throwing the

The difference between "what might have been" and what actually happened in this case is large and critical. Where the jury actually "acquits" under an erroneous instruction, a successful appeal leading to reversal and a new trial would raise serious constitutional problems by placing the defendant through the hazards of another trial for the same offense. In this case, however, there is no possibility of subjecting Sisson to another trial, or of overturning a factfinder's decision that, whatever the law, Sisson should go free. If Judge Wyzanski's legal theory is incorrect, the jury's verdict of guilty—with judgment no longer "arrested"—simply remains in effect.

It was precisely this distinction that Senator Knox was referring to in the passage quoted in the majority opinion, *ante,* at 289: the defendant retains the benefit of any error whatever committed by the court *"in the trial"*; but the Government gets an appeal "upon ques-

---

baby out with the bathwater in order to declare this case an "acquittal" and thus avoid being forced to reach the merits now.

What other reason is there for deciding that this is a case of "acquittal"? One obvious suggestion is that the question of whether a judge's action amounts to an "acquittal" admits of no single answer, but depends on the reasons for making the inquiry in the first place. Here the inquiry is whether Congress meant to allow an appeal where a statute had been held invalid as applied to a class within its reach and where the defendant's constitutional jeopardy interests are in no way threatened by the appeal. The majority's absolute refusal to discuss or respond to the legislative history on this question, set out below, see *infra,* at 335–346, indicates that this approach would also lead to the conclusion that Judge Wyzanski granted an appealable "motion in bar" rather than an "acquittal."

The only other noncircular answer that I can find in the majority's opinion is that this is an acquittal because the judge "might have" sent the case to the jury under his novel instructions, resulting in a verdict of not guilty, from which an appeal would indeed jeopardize the defendant's constitutional interests. That answer, as the majority's discomfiture indicates, is not a very good one.

tions of law raised by the defendant to defeat the trial."
The distinction is also reflected in the majority's quotation
from *United States* v. *Ball, ante,* at 289–290, where the
question of what constitutes an "acquittal" is tied to the
question of whether the defendant would be put "twice
in jeopardy" by an appeal.

I suspect that the Court's reluctance to discuss the
"motion in bar" provision and to distinguish the granting
of such motions from an acquittal stems from the fact
that, unlike the "motion in arrest," there is no doubt
that a "motion in bar" properly sets forth an affirmative
defense, which necessarily requires resort to facts not
found in the indictment or on the face of the "record."
Thus most of the majority's argument that this case is
not appealable as a "motion in arrest" because "[t]he
decision below rests on affirmative defenses," *ante,* at
287–288, is simply irrelevant as far as the "motion in bar"
is concerned.

In fact, as the majority seems to concede by its re-
luctance to reject square precedent on the issue, see
*ante,* at 300 n. 53, our cases make clear that the phrase
"motion in bar" would include a plea like Sisson's
that the selective service laws are unconstitutional as
applied to him. The Court has never adopted the view
that a "motion in bar" encompasses only the common-law
defenses of *autrefois acquit, autrefois convict,* and pardon.[5]
Neither did Congress when it passed the Act. The
debates show that the plea in bar was thought to embrace
such a variety of defenses as the statute of limitations,
*e. g.,* 41 Cong Rec. 2749, and a plea of Fifth Amendment

---

[5] One will search the majority's opinion in vain for an explana-
tion as to why "motion in arrest" must be pinned to its common-
law meaning, while "motion in bar"—which the majority also con-
cedes had a unique meaning at common law, see *ante,* at 300 n. 53—
has never been so confined. See *United States* v. *Covington,* 395
U. S. 57 (1969) (HARLAN, J.); *United States* v. *Blue,* 384 U. S. 251
(1966) (HARLAN, J.).

immunity, see 41 Cong. Rec. 2753. The most thorough discussion of the "motion in bar" in this Court occurs in the concurring and dissenting opinions in *United States* v. *Mersky*, 361 U. S. 431 (1960). MR. JUSTICE BRENNAN argued that a motion in bar would encompass every possible affirmative defense that would prevent retrial. MR. JUSTICE STEWART argued for a narrower interpretation, similar to the concept of a plea in confession and avoidance, *i. e.*, a plea that "did not contest the facts alleged in the declaration, but relied on new matter which would deprive those facts of their ordinary legal effect." *Id.*, at 457.

Even under the narrower interpretation of MR. JUSTICE STEWART, Sisson's plea qualifies as a "motion in bar." For as the majority's opinion makes clear, the crux of the case against Sisson was simply whether or not he had wilfully refused to submit to induction; the question of his sincerity was "new matter" relied on to deprive the fact of his wilfull refusal of its ordinary legal effect. See majority opinion, *ante*, at 276; *United States* v. *Blue*, 384 U. S. 251, 254 (1966) (HARLAN, J.). Just as our cases have permitted the "motion in bar" to embrace limitations pleas, see, *e. g.*, *United States* v. *Goldman*, 277 U. S. 229 (1928), and pleas of constitutional privilege, see *United States* v. *Murdock*, 284 U. S. 141 (1931), so too they permit the "motion in bar" to reach cases of this sort, attacking the validity of the statute as applied to the defendant. See *United States* v. *Covington*, 395 U. S. 57 (1969) (HARLAN, J.); *United States* v. *Blue*, *supra*, at 254 (HARLAN, J.).

Procedurally, the fact that the plea is sustained only after a jury verdict of conviction—and the fact that the judge labeled his action as something other than a "motion in bar"—does not prevent finding a "motion in bar." *United States* v. *Zisblatt*, 172 F. 2d 740, 742 (C. A. 2d Cir.), appeal dismissed, 336 U. S. 934 (1949). Even

the legislative history recognizes that such pleas could be sustained after the trial had begun. 41 Cong. Rec. 2749 (remarks of Senator Rayner). Nor is there any doubt—unlike the case of a motion in arrest—that a proper motion in bar results even though factual issues relevant to the motion have to be tried. See 41 Cong. Rec. 2194 (remarks of Senator Whyte); *id.*, at 2753 (remarks of Senator Patterson); *United States* v. *Zisblatt, supra.* Indeed, MR. JUSTICE HARLAN recently referred to the possibility of trying facts to the judge that were relevant to the motion in bar, and separate from the general issue. See *United States* v. *Covington, supra,* at 60. In his words, "[a] defense is thus 'capable of determination' [without trial of the general issue] if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." *Ibid.* That description fits this case precisely since, as already noted, the majority itself takes careful pains to point out that the "general issue"—whether Sisson wilfully refused induction—was at all times separate from the issue raised by Sisson's constitutional claim.[6]

---

[6] The majority concedes that the judge's instructions to the jury excluded the question of Sisson's sincerity from the question of Sisson's guilt under the Act. See *ante,* at 276. Indeed, Sisson's sincerity could not possibly bear on whether Sisson had wilfully refused induction: since Sisson did not seek a I–O classification, he could not even argue his "sincerity" to show "no basis in fact" for his I–A classification. Moreover, as the majority again points out, *ante,* at 274 n. 2, even Sisson recognized that his "selective" objection to war foreclosed him from obtaining C. O. status under the Act. Sisson's sincerity was thus relevant only to his constitutional defense and was as distinct from the issue on the merits as would have been a claim that the prosecution was time barred. In that sense, the factual questions relevant to Sisson's motion were not part of "the general issue," I do not read THE CHIEF JUSTICE's opinion, which discusses Sisson's defense in a wholly different context, as suggesting anything different. The majority's suggestion, *ante,* at 299,

This case, then, is indistinguishable as far as the "motion in bar" provision is concerned from *United States* v. *Zisblatt, supra,* which the majority cites with approval throughout its opinion. There, as here, the de-

that a defense of privilege in a speech case may involve facts inextricably intertwined with the general issue, and the majority's reference to *United States* v. *Fargas, ante,* at 301, are perfect examples of repeated refusal to come to grips with the facts of this particular case where the issues were not and could not have been intertwined. Whether Sisson might have demanded a jury trial on the facts relevant to his motion is also a question not presented here, anymore than it was in *United States* v. *Covington,* 395 U. S. 57 (1969) (HARLAN, J.).

The legislative history makes clear that trying facts that go to the plea, as opposed to facts that go to the "general issue" in the sense just described (whether the defendant committed the act) results in an appealable motion in bar as long as the defendant has not been "put in jeopardy." Compare 41 Cong. Rec. 2750 (remarks of Senator Nelson), with *id.,* at 2753 (remarks of Senator Patterson). See text, *infra,* at 340–341. The reason for the distinction appears to be the wholly sensible one of not permitting appeals that might involve overturning the findings of the trier of fact—whether it be judge or jury. Nobody suggests in this case that Judge Wyzanski's findings as to Sisson's sincerity are reviewable; the only question is whether those findings are legally relevant. While I can sympathize with the majority's concern to distinguish *Covington,* I do not see the relevance of the purported distinction, see *ante,* at 302–303, n. 56. There, as here, the trial judge explicitly refused to declare the relevant Act unconstitutional on its face and necessarily rested his action on factual findings concerning the particular defendant, see 282 F. Supp. 886, 889–890. In fact, under the majority's reasoning, it would have been even easier to argue in *Covington* that the facts needed to prove the constitutional defense were part of the "general issue," since proof at a trial on the merits would necessarily have involved developing such things as defendant's status as a marihuana dealer. The majority suggests that there the Government conceded the relevant facts, whereas here they were contested. While that suggestion is itself highly dubious, see THE CHIEF JUSTICE'S opinion, *ante,* at 312, until the majority explains how that distinction is at all rele-

fendant moved for dismissal of the indictment on the basis of an affirmative defense—in that case the statute of limitations. There, as here, the judge reserved ruling on the motion until after the jury had returned a verdict of guilty. There, as here, the judge then granted the defendant's motion, relying on matters "outside the record." The Government appealed to the Court of Appeals, where the question became whether or not the appeal should have been taken directly to this Court under the Criminal Appeals Act. Judge Learned Hand, in deciding that the trial court's action amounted to sustaining a motion in bar, made short shrift of the argument that the case was indistinguishable from the case of a directed verdict of acquittal.

> "Had the trial judge directed a verdict, so that it would have been necessary upon reversal to subject the defendant to trial before a second jury, that would be 'double jeopardy,' but, although the Constitution gives an accused person the benefit of any mistakes in his favor of the first jury he encounters, whether it has passed upon his guilt or not, it does not extend that privilege to mistakes in his favor by judges. Indeed, were the opposite true, all appeals from decisions in arrest of judgment would be constitutionally futile because no judgment of conviction could be entered when they were reversed." 172 F. 2d, at 743.

---

vant, reiterating the distinction again only begs the issue posed by this case. See n. 5, *supra*. For whether the issue was conceded or contested it remains true under the majority's analysis that *Covington* cannot be distinguished from a directed acquittal "entered on the ground that the Government did not present evidence sufficient to prove that [Covington] was [not faced with a substantial possibility of incrimination]." Majority opinion, *ante*, at 299.

The sole question, then, in this case as in *Zisblatt*, is whether the defendant has been "put in jeopardy" as that phrase is used in the Criminal Appeals Act. That question in turn centers on whether the phrase is to be read literally, in which case a defendant would be in jeopardy as soon as a jury was impaneled, or whether the phrase is to mean "constitutional" or "legal" jeopardy, in the sense that even if the Government were to succeed on appeal, it would be unable to take advantage of its success in new proceedings against the defendant. Although the Government has chosen to read the statute in the former, literal sense, this Court has never resolved the issue. Judge Learned Hand thought there was a "more than plausible argument" for the latter, "legal jeopardy" view, but the Government dismissed its appeal to this Court before the question could be decided. *United States* v. *Zisblatt, supra,* at 742.

The legislative history of the 1907 Act unmistakably shows that Congress meant to allow the Government an appeal from a decision sustaining a motion in bar in every case except where the defendant was entitled to the protection of the constitutional guarantee against double jeopardy. I find the debates so convincing on that point that I am at a loss to understand why the Government has so readily conceded the issue unless it be to maintain the appearance of consistency, and to protect its interests in securing new criminal appeals legislation before Congress.[7] Certainly that concession

---

[7] See majority opinion, *ante,* at 306–307, n. 61. Of course, the legislation that the Government sought shortly after the Act was passed—requiring a defendant to raise his defenses before trial—does not necessarily mean that the then-Attorney General interpreted "jeopardy" to mean literal jeopardy. The legislation would have been equally needed to prevent defendants from waiting until "constitutional jeopardy" had attached, before securing relief on a motion

does not bind this Court; [8] even more certainly it is no excuse for the majority's failure to conduct its own examination of the relevant debates.

Out of three full days of debate in the Senate, covering more than 30 pages of the Congressional Record, see 41 Cong. Rec. 2190–2197, 2744–2763, 2818–2825, the majority finds a total of three passages to cite in a footnote as support for its interpretation, see *ante,* at 304–305, n. 57. In each case, the statements placed in context prove just the opposite of the majority's conclusion. The first reference, to a passage before debate even began, 40 Cong. Rec. 9033, is to Senator Spooner's

---

in bar. Indeed, it is because it was thought that "constitutional jeopardy" had attached in the *Beef Trust Case* (*United States* v. *Armour & Co.*), 142 F. 808 (D. C. N. D. Ill. 1906) that no appeal was thought to lie. See *infra,* at 341–342. Since the *Beef Trust Case* was the motivating force behind the Criminal Appeals Act, it would be natural for the Attorney General to seek legislation that would force a similar defendant to raise and get a decision on his plea in bar before trial began, thus avoiding any possibility that the defendant would escape by being placed in legal jeopardy.

[8] To argue that the statute was enacted for the benefit of the Department of Justice hardly justifies relying on the Government's concession as additional authority for the proper interpretation of the Act. The relationship of the Department of Justice to the Criminal Appeals Act is not that of an agency to the statute creating the agency and charging it with enforcement of the Act's provisions. Indeed when it comes to the question of this Court's jurisdiction, no institution has special authority for exploring and determining that question other than this Court. The Solicitor General in this case is simply one of the litigants; to give special weight to his strategy in arguing this case at the very least does a disservice to Sisson, who—seemingly contrary to his own interests—has also made a concession: namely, that this Court does have jurisdiction under both the "motion in bar" and "motion in arrest" provisions. The views of the Justice Department on the "motion in bar" provision are entitled to precisely the same weight as the majority extends to Sisson's views and to the Justice Department's views on the "motion in arrest" provision.

question whether the bill applied only to questions arising before the impaneling of the jury. As the majority acknowledges, Senator Nelson immediately corrected Senator Spooner, pointing out that the key question was "jeopardy," not the impaneling of the jury. The entire brief exchange occurred before the bill was debated, further consideration having immediately been postponed by the objection of other Senators to pursuing the matter at that time. See F. Frankfurter & J. Landis, The Business of the Supreme Court 117 n. 68 (1928). When debate was resumed at the next session of Congress, Senator Spooner unmistakably indicated that jeopardy was being used in the constitutional, legal sense, in direct opposition to the views the majority now tries to ascribe to him:

> "The question is whether it subjects a man under any aspect of it to the danger of double jeopardy.
>
> .        .        .        .        .
>
> I am content to leave it, under the bill, if it shall become a law, to the Supreme Court of the United States. It is their function to determine what is jeopardy. It is their function to protect the citizens of the United States against any invasion of the constitutional guaranty as to double jeopardy. I think we can rely upon the court to protect as far as the Constitution requires it all defendants . . . ."
> 41 Cong. Rec. 2762–2763 (remarks of Sen. Spooner).

In the second passage, 41 Cong. Rec. 2191, the majority quotes Senator Nelson for the proposition that no appeal would lie where a jury had been impaneled. The actual quotation is that no appeal would lie "where a jury has been impaneled *and where the defendant has been tried* . . . ." 41 Cong. Rec. 2191 (emphasis added). In context, it is clear that Senator Nelson is venturing an interpretation of "jeopardy" in the legal sense. The whole dispute at this point in the debate is

primarily between Senator Rayner who opposed the bill, and Senators Bacon and Nelson, who supported the bill. The proponents were at pains to show that a person could not be "put twice in jeopardy" under any of the provisions of the bill, 41 Cong. Rec. 2193 (remarks of Sen. McCumber; remarks of Sen. Bacon). Senator Rayner was intent on showing how difficult it was for anyone to give an adequate definition of just what "legal jeopardy" is—he supported a return to the House suggestion, which would have given the defendant the benefit of his favorable decision whether or not he had been "put in jeopardy." But not a single passage can be cited to show that either side had the slightest inkling that "jeopardy" was being used in any but its technical, legal sense as interpreted by this Court and state courts. That was the whole point of Senator Rayner's objection: "jeopardy" was too vague a term, because nobody could decide exactly when constitutional jeopardy had attached. How the majority can rely on Senator Nelson for the conclusion that "jeopardy" means "literal" jeopardy is particularly difficult to understand, given the Senator's own unambiguous explanation that as author of the bill, what he meant was "constitutional" jeopardy:

> "I aimed to put the bill in such a form that it would cover exactly those cases in which the defendant had not been *put in jeopardy under the Constitution of the United States.* I believe that the bill is limited strictly to that matter." 41 Cong. Rec. 2757 (emphasis added).

Senator Bacon during this same exchange noted that the "jeopardy" provisions had been put in "out of abundance of caution," 41 Cong. Rec. 2191. He proceeded to explain by his remarks that he meant precisely what the majority today declares he could not have meant— namely, that Congress was simply emphasizing that it was not attempting to subject a defendant to constitu-

tional double jeopardy by a successful government appeal. In fact, when one of the Senators asked whether "jeopardy" was to be taken in a possibly literal sense, Senator Bacon hastened to reply:

> "That is not *what the law means by being put in jeopardy* at all. The words 'being in jeopardy' are entirely a technical phrase, which does not relate to the fact that a man is in danger as soon as an indictment is preferred against him." 41 Cong. Rec. 2191 (emphasis added).

It is hardly "superfluous" for Congress to guard against a construction of an Act that might render the Act unconstitutional. And the fact that the majority would have written the statute differently to avoid what it calls a "superfluous" reading, is no excuse for ignoring the explicit indication that that is exactly the reading that Congress meant the phrase to bear.[9]

---

[9] This interpretation is reinforced at other points in the debate in a manner that also explains why the "jeopardy" language occurs in the motion-in-bar provision, and not in the other provisions. The Senators thought that indictments would normally be dismissed before trial began, so there would be no "jeopardy" problems in allowing appeals in such cases. Similarly, a motion in arrest after judgment was thought to involve no jeopardy problems, because the defendant made the motion himself in an attempt to overturn a verdict of guilty. See 41 Cong. Rec. 2753. But it was recognized that the motion in bar could be granted after trial had started, see 41 Cong. Rec. 2749; and it was not obvious whether in such a case "jeopardy" would have attached in the constitutional sense to prevent retrial. Hence, the "jeopardy" language was added "out of abundance of caution" to make clear that Congress was simply bringing that provision into line with the other provisions: *i. e.,* appeals were to lie only where "constitutional jeopardy" had not attached; but jeopardy, not the impaneling of the jury, was to be the test of appealability in the case of the motion in bar just as in the case of the motion in arrest. See 41 Cong. Rec. 2191 (remarks of Senator Bacon); 41 Cong. Rec. 2756 (remarks of Senator Nelson) ("out of extreme

The majority's final passage refers to a remark by Senator Patterson suggesting that a motion in arrest was the only provision under the bill that could be raised after a trial had begun. As the majority concedes, one need only read on a bit further to discover that Senator Patterson immediately retracted that suggestion when challenged, insisting that a "motion in bar" could also be granted after trial had begun and that an appeal would lie as long as no problem of "constitutional jeopardy" was presented. Indeed, Senator Patterson argued vigorously that there would have been jurisdiction in the *Beef Trust Case*—a case in which the motion in bar was not only granted after trial had begun, but was also reflected in the judge's instructions to the jury. Senator Patterson's remarks are particularly interesting because, apart from whether he is right on the question of constitutional jeopardy, he makes clear the distinction between a motion in bar and an acquittal which the majority blithely ignores:

> "A special plea in bar . . . is a plea that does not relate to the guilt or innocence of the defendant in the sense as to whether he did or not commit the act for which he was indicted. A special plea in bar is that which is set up as a special defense notwithstanding the defendant may be guilty of the offenses with which he is charged; it is for some outside matter; yet it may have been connected with the case. The special plea in bar that was filed by the indicted Chicago packers is a very good illustration of that. Their plea in bar set forth the fact of their having been induced or led, whatever it may have been, to make communications to the

---

caution and to put it exactly in harmony and in line with the provisions of the three preceding paragraphs, we have expressly provided that where the defendant has been put in jeopardy he can not be reindicted").

law officers of the Government with reference to their business that gave the district attorney information which enabled him to bring about the indictments and to help in their prosecution. That had no reference to the guilt or innocence of the accused. It was a pleading of fact that was independent of the crime for which those packers had been indicted.

"Therefore, Mr. President, there could be no jeopardy in a case of that kind where there was a decision upon the special plea in bar, because it is not under a plea of guilty or not guilty that the insufficiency of a special plea in bar is determined; it is non obstante whether the defendant is guilty or not guilty." 41 Cong. Rec. 2753.

It is obvious from these remarks that Senator Patterson did not think that the question of "jeopardy" under the motion-in-bar provision was simply a question of whether the jury had been impaneled.[10]

This interpretation is made doubly clear by the remarks of Senator Nelson, the leading proponent of the bill. He also addressed himself to the *Beef Trust Case* and, unlike Senator Patterson, he suggested that that case could not have been appealed under the Act. But the reason he gave for that conclusion was not that the jury had been impaneled, but that the jury had been impaneled *and had returned a verdict of not guilty* under the judge's instructions, thus placing the defendants in "legal jeopardy":

"In that case a jury was impaneled, and the question whether the defendants were entitled to im-

---

[10] The majority's apparent willingness to accept Senator Patterson's suggestion that the *Beef Trust Case* could have been appealed, *ante*, at 304 n. 57, virtually concedes the issue. For the whole point is that in distinguishing between the plea and the issue on the merits, the Senator was plainly giving his views as to what constitutes "legal jeopardy."

munity under the immunity law because they had furnished Mr. Garfield and the officials of his Bureau information was submitted to the jury, and the jury under instructions of the court found for the defendants. In that case the defendants *under the Constitution had been in jeopardy* and in that beef-trust case no appeal could lie." 41 Cong. Rec. 2757 (emphasis added).

See 41 Cong. Rec. 2750 (remarks of Senator Nelson).

Senator Nelson was thus talking about the majority's "might have been case"—the case where the judge gives the motion in bar issue to the jury under his novel view of the law, so that a successful government appeal would require retrying the defendant. In the immediately following passage, Senator Nelson makes clear that if the facts pleaded in the special issue are not submitted to the jury, but tried to the judge, there would be no bar to taking an appeal. But in both cases, Senator Nelson, like Senator Patterson, is quite obviously giving his views as to what "constitutional jeopardy" means.

While the debates are replete with other indications that Congress' concern was with "double jeopardy," not "literal jeopardy," the clearest such indication occurs in this very exchange between Senator Rayner, who announced his opposition to the bill in any form, 41 Cong. Rec. 2745, and Senators Spooner, Patterson, and Nelson—proponents of the bill. The exchange occupied most of the second day of the three days of debate in the Senate and centered almost entirely on Senator Rayner's proposed amendment. The example that Senator Rayner used to illustrate the difficulties he saw in the bill was a hypothetical case in which a plea in bar—a limitations plea—was sustained halfway through the trial. See 41 Cong. Rec. 2749. In that case, Senator Rayner argued, no one could say with certainty whether the de-

fendant had been put in jeopardy, and hence whether he could constitutionally be retried if the Government's appeal were successful. Senator Rayner did not want to leave the defendant's fate to depend on "this howling wilderness of confusion upon the subject of what constitutes *legal jeopardy*." 41 Cong. Rec. 2750 (emphasis added). His amendment would thus have guaranteed that a defendant could never be retried—whatever the ultimate resolution of the "legal jeopardy" question. Those who opposed the amendment argued that if it had any substantive effect, it would make the question on any appeal "moot"; that it was enough to make sure that the Government was not allowed to secure a reversal and proceed again where the result would place the defendant in "double jeopardy"; and that the bill would leave to the Supreme Court the question of what is "jeopardy," and hence protection "against any invasion of the constitutional guaranty as to double jeopardy." 41 Cong. Rec. 2761–2763; see also 41 Cong. Rec. 2193. But it is clear—indeed it was again crucial to Senator Rayner's argument—that the Senators assumed that "jeopardy" was being used in the legal sense:

> "The question is whether it subjects a man under any aspect of it to the danger of double jeopardy.
>
> .        .        .        .        .
>
> "The Senator [Rayner] says he does not care whether it is double jeopardy or not. Even if a man under the Constitution may properly and lawfully be put on trial again, if he has been tried once, even though it were a mistrial, if he had been for a moment in jeopardy, he insists that we shall provide by law, no matter what the case may be, that he shall not be tried again; that he shall go acquit.
>
> .        .        .        .        .
>
> "The matter has been thoroughly argued. I am content to leave it, under the bill, if it shall be-

come a law, to the Supreme Court of the United States. It is their function to determine what is jeopardy. It is their function to protect the citizens of the United States against any invasion of the constitutional guaranty as to double jeopardy. I think we can rely upon the court to protect as far as the Constitution requires it all defendants, without supplementing the Constitution by the Senator's amendment to this bill." 41 Cong. Rec. 2762–2763 (remarks of Senator Spooner).[11]

Senator Rayner's hypothetical example of a plea in bar sustained *after trial had begun*—an example accepted without question by Senators Patterson, Nelson, and

---

[11] It should be noted that even Senator Rayner's amendment did not purport to narrow the scope of cases in which the Government could appeal; it only sought to remove any "double jeopardy" problem by declaring that the defendant should retain a favorable decision, whatever the result on appeal.

On the third day of debate, the amendment was agreed to, modified to read:

"*Provided,* That if upon appeal or writ of error it shall be found that there was error in the rulings of the court during the trial, a verdict in favor of the defendant shall not be set aside." 41 Cong. Rec. 2819.

Senator Rayner's earlier opponents continued to insist that no material change had been made by the amendment, since as they had argued, there would be no appeal in any event where the defendant had received a "verdict" in his favor, see opinion of THE CHIEF JUSTICE, *ante,* p. 308, as opposed to securing a favorable "judgment" by the trial court's action in sustaining his plea or arresting judgment. See 41 Cong. Rec. 2820. Without explanation, the Conference Committee changed the amendment to read:

"*Provided,* That no writ of error shall be taken by or allowed the United States in any case where there has been a verdict in favor of the defendant."

Subsequent amendments to the Act omitted the proviso altogether (which no longer appears in the current version) thus vindicating the arguments of Senator Rayner's opponents that the amendment had no substantive effect.

Spooner, and every other Senator participating in the debate—completely undercuts the majority's assertion that Congress thought there could be no appeal once the jury had been impaneled. Indeed, in the face of the arguments over the meaning of "jeopardy" and Senator Rayner's vigorous attack on the vagueness of that term, it is nothing short of incredible for the majority to suggest that Congress left that language in the Act, intending it to be interpreted as providing "a clear, easily administered test," *ante,* at 307. If Congress had intended the majority's interpretation it would have been both simple and logical to explicitly limit appeals to cases "where the jury has not yet been impaneled," thus avoiding the possibility of confusion which had been the very topic of discussion for three full days of debate.

The plain fact of the matter is that the majority's *post hoc* rationalization of the Act simply was not that of Congress. While the debates show considerable disagreement about the meaning of "jeopardy" in the legal sense, there is not the slightest suggestion anywhere in the legislative history that "jeopardy" is being used in any other sense. Even where references occur to the impaneling of the jury as the moment when jeopardy attaches, it is clear that jeopardy is still being used in its legal sense—after all, as the majority itself notes, *ante,* at 305, the impaneling of the jury does in fact often become the constitutionally relevant point in determining that "legal jeopardy" has attached to prevent a reprosecution. But the one point on which there was unanimous agreement—even from Senator Rayner, see, *e. g.,* 41 Cong. Rec. 2748—about the meaning of "jeopardy," was that where a convicted defendant on his own motion had secured the arrest of a jury's verdict of guilty, he had not been placed in "jeopardy." "[T]he defendant could not complain, either if the judgment of the court shall be entered upon the verdict or a new trial

shall be ordered, because it is giving to the defendant a new opportunity to go acquit when, under the trial that was had, he had been convicted." 41 Cong. Rec. 2753.

For this Court to hold that Sisson has been placed in jeopardy under the motion-in-bar provisions, thus defeating jurisdiction, the Court must be prepared to hold that a successful appeal by the Government, resulting in an order that judgment be entered on the verdict, would violate Sisson's double jeopardy protection. Judge Learned Hand refused even to consider such a suggestion in *Zisblatt:* "So long as the verdict of guilty remains as a datum, the correction of errors of law in attaching the proper legal consequences to it [does] not trench upon the constitutional prohibition." 172 F. 2d, at 743.

### III

I find extremely peculiar the path that the Court follows in reaching its conclusion that we cannot hear this case. The "motion in arrest" provision is confined to its early common-law sense, although there is absolutely no indication that Congress was using the phrase in that sense, and we have never similarly limited the "motion in bar" provision to its common-law scope. The alleged trouble with the "motion in arrest" is not any problem of jeopardy, but the fact that Judge Wyzanski relied on facts outside the face of the "record." Conversely, the trouble with the "motion in bar" provision is not the use of outside facts, but solely the fear that Sisson was "put in jeopardy." If this were a motion in arrest, there would be no "jeopardy" problem; and if this were a motion in bar, resort to outside facts would pose no problem. The apparent inconsistency and the refusal to hear the case appear to be due to a dogged determination to fit Judge Wyzanski's action into one "common-law pigeonhole," *United States* v. *Mersky,* 361 U. S. 431, 442 (BRENNAN, J., concurring), or the other

while paying scant attention to the reason for trying to make the fit in the first place, with the result that Judge Wyzanski's action is to be given the no less distorting label of "acquittal."

The question in this case should simply be whether or not a judge who upholds a claim of constitutional privilege, thereby declaring the statute unconstitutional as applied, has entered a judgment that Congress intended this Court to be able to review. Surely in a statute as unclear and ambiguous as the majority says this unhappy Act is, the "words" of the statute are only the first place to start the task of interpretation. The primary guide to interpretation should be the statute's purpose, as indicated by the evil that prompted it, and by the legislative history.

The Act was passed to remedy the situation that gave a single district judge the power to defeat any criminal prosecution instituted by the Government, and to annul as unconstitutional, attempts by Congress to reach a defendant's specified conduct through the use of the criminal machinery. Over and over, this theme is repeated in the debates on the bill, dominating every other topic of discussion except the concern for safeguarding the defendant's privilege against double jeopardy. As THE CHIEF JUSTICE's opinion details, it is difficult to imagine a case more closely fitting the type of case in which Congress intended to allow an appeal than the instant one.

The majority suggests that we must remember that the Act was "a compromise," and that Congress was very concerned about not unduly encroaching on the rights of the defendant. But the "compromise" between the House and the Senate was only over the areas in which to allow appeal—there was complete accord that constitutional cases of this sort constituted one of those areas; they were indeed the Act's *raison d'être*. Simi-

larly while Congress was concerned to protect the defendant's rights, it had no doubt that those rights were not invaded where a defendant had been found guilty, and the Government appealed the judge's decision that for legal reasons the verdict could not stand. The majority, in short, pays lip service to the policies of the Act without ever applying those policies to the question presented in the case before it. Judge Wyzanski, anxious to do his duty as he saw it, and yet aware that ultimate resolution of the constitutional issue properly belongs in this Court, had two means of passing on the issue while still protecting Sisson's rights: he could have granted Sisson's motion after a pretrial hearing, see *United States* v. *Covington,* 395 U. S. 57, 60; Fed. Rules Crim. Proc. 12 (b)(1), 12 (b)(4), or he could, as here, grant the motion only after the jury's verdict of guilty forced him to reach the constitutional question. In either case, none of the interests reflected in the jeopardy provisions of the Constitution—protecting defendants from repeated and harassing trials for the same offense—is in any way endangered. In fact, Sisson's interests if anything are less in jeopardy in the second case than the first where the Government's appeal would force a long delay in beginning the trial itself.

The conclusion that Congress intended judgments of this kind to be reviewed seems to me so clear, that I suspect the majority's neglect of this aspect of the statute amounts to a tacit admission that policy and purpose point overwhelmingly toward finding jurisdiction. If that is the case, then to hang Congress on the technical meaning of the obscure legal terms it happened to use is not only inappropriate, but is strangely out of line with decisions that leap over the plain meaning of words in other contexts to reach conclusions claimed to be consistent with an Act's broader purposes. See *Welsh* v. *United States,* 398 U. S. 333 (1970); *Boys*

*Markets, Inc.* v. *Retail Clerks Union,* 398 U. S. 235 (1970); *Toussie* v. *United States,* 397 U. S. 112 (1970); *United States* v. *Seeger,* 380 U. S. 163 (1965). Compared to some of these examples of "statutory construction," it is child's play to conclude that Congress did not really mean to limit "motion in arrest" to its old common-law meaning, or that at least if it did, it thought decisions such as Judge Wyzanski's would have been appealable under some other provision, such as the "motion in bar" as long as there was no danger of encroaching on the defendant's jeopardy interests.

Admittedly, the issues raised by Sisson are difficult and far-reaching ones, but they should be faced and decided. It is, to be sure, much more comfortable to be able to control the decision whether or not to hear a difficult issue by the use of our discretion to grant certiorari. But that is no excuse for ignoring Congress' clear intent that the Court was to have no choice in deciding whether to hear the issue in a case such as this. The fear expressed in the prevailing opinion that if we accept jurisdiction we shall be "cast adrift" to flounder helplessly, see *ante,* at 299, has a flavor of nothing so much as the long-discarded philosophy that inspired the old forms of action and that led to the solemn admonition in 1725 that "[w]e must keep up the boundaries of actions, otherwise we shall introduce the utmost confusion." *Reynolds* v. *Clarke,* 93 Eng. Rep. 747, 748 (K. B. 1725). I cannot agree. I would find jurisdiction.